Sergeant Donna M. HURLEY, Plaintiff,

v.

The ATLANTIC CITY POLICE DE-PARTMENT, Henry Madamba, and Nicholas Rifice, Defendants.

Civil Action Nos. 93–260 (JEI), 94–1122 (JEI).

United States District Court, D. New Jersey.

July 12, 1996.

---

**6.** The Court notes that the defendants have not argued that they possess any type of immunity.

Van Syoc Law Offices, Chartered by Clifford L. Van Syoc (argued), Cherry Hill, NJ, for Plaintiffs.

Tuohy & Tuohy by Dennis M. Tuohy (argued), Michael Blee (argued), Atlantic City, NJ, for Defendant Atlantic City Police Department.

Barry & McMoran, P.C. by Madeline Cox, Mark Falk (argued), Newark, NJ, for Defendant Henry Madamba.

Hankin Sandson & Sandman, P.C. by Thomas F. Bradley (argued), Atlantic City, NJ, for Defendant John Mooney.

Marshall, Dennehey, Warner, Coleman & Goggin by Richard L. Goldstein (argued), Marlton, NJ, for Defendant Nicholas Rifice.

IRENAS, District Judge:

Following a sexual discrimination trial which lasted from November 27, 1995, through February 13, 1996, and which resulted in a jury verdict finding liability against defendants Henry Madamba and the Atlantic City Police Department ("ACPD"), defendants move for a new trial based on insufficiency of the evidence and alleged errors in evidentiary rulings, legal decisions, and the jury charge. In the alternative, defendants seek remittitur of the $575,000 in compensatory damages awarded against Madamba and the ACPD and the $700,000 in punitive damages awarded against the ACPD. Because the findings of the jury were supported by substantial evidence and the trial was not infected by prejudicial error, defendants' motions for a new trial will be denied. Their motions for remittitur will be granted with respect to the compensatory damages, which shall be remitted from $575,000 to $175,000, but denied as to punitive damages.

Defendants Rifice and Mooney, as well as plaintiff, move for counsel fees as prevailing parties under the relevant fee-shifting statutes. Both defendants' fee petitions will be denied because plaintiff's suit against them was not baseless, but plaintiff's application will be granted, subject to its submission to the Court, within three weeks of the date of this opinion, of revised timesheets which exclude hours spent in pursuit of unsuccessful claims and parties.

## I. INTRODUCTION

At the heart of Donna Hurley's case is the claim that she faced a hostile work environment. Unlike other forms of sexual discrimination, employer liability for a hostile work environment is created not by the random crude acts of employees, but rather by the employer's reaction or non-reaction to these acts. As women increasingly enter workplaces historically reserved for men, particularly those which value traditionally "male" virtues such as physical strength and courage, it is not surprising that some male employees will by word or deed display their displeasure at this female "intrusion." An employer cannot sit back and adopt a "boys will be boys" attitude when this happens; it must move promptly and forcibly to make it clear to the entire workforce that conduct which demeans women or makes them feel unwelcome will not be tolerated. The jury's verdict in this case suggests that the ACPD did not understand its obligation to its female employees.

At trial, defendant Henry Madamba referred to the bulk of the harassment Donna Hurley faced as "childish stuff,"[1] and his attorneys continue to insist that although the conduct to which Donna Hurley was exposed during her career at the ACPD "was childish, it was not egregious."[2] This characterization exemplifies the attitude Donna Hurley faced from the day she joined the ACPD. The ACPD leadership ignored the misogyny that pervaded her working environment, underestimated its hurtfulness, and failed to take appropriate remedial action.

The ACPD's apathetic attitude was apparent even at trial. The ACPD referred extensively to its written anti-harassment policies, which were developed, for the most part, after the events at issue in the case. But written policies do not change behavior; actions do. The ACPD is a disciplined, hierarchical organization with the authority to enforce its policies. Unfortunately, it appears to have drafted the policies primarily in order to hide behind them, not to change behavior.

The ACPD pointed out repeatedly during trial that every time Hurley complained of bathroom graffiti, the ACPD painted over the wall. Yet it concedes that it never conducted an investigation into the harassment. (Tr. 152.) It never punished anyone. (Tr. 262.) It never even asked the patrol officers, as a group, to stop. And the pace at which the ACPD painted over the graffiti was measured in weeks or months rather than, as it should have been, in minutes. Indeed, throughout the trial the ACPD's attorney, by his questions to witnesses, repeatedly suggested that sexual graffiti was not even an issue of sexual harassment, but merely a matter of defacing public property.

The ACPD argues that it could never have caught the culprits behind the drawings. Whether true or not, this misses the point. Until 1992, when technology improved, the ACPD could not catch the malefactors (Tr. 3182) who engaged in the ubiquitous practice of using their hand-held radios to disconnect the radio conversations of their colleagues and supervisors, known as "keying out" or "clicking out."[3] But this did not prevent the ACPD from trying, especially when senior supervisors were affected. Unlike lewd drawings and vile comments, which Madamba viewed merely as "prankish," (Tr. 4332), "clicking out" was a practice that really "pissed off" Madamba. (Tr. 4255). He and others took strong action to stop it. (Tr. 4255.) ACPD senior officers conducted investigations (Tr. 4255), wrote reports (Tr. 4497), and threatened at roll call to discipline anyone caught doing it (Tr. 612, 647–648). The ACPD's reaction to "clicking out" thus stands in sharp contrast to its apathy in the face of overwhelming evidence that Donna Hurley was the victim of sexual harassment.

---

1. Trial Transcript at page 4332. Subsequent references to trial testimony will be cited in the body of the opinion to the page on which they may be found.

2. Madamba Brief at 1. An example of the "childish" harassment to which Hurley was exposed was found in a commonly used ACPD bathroom that was open to the public:

 Oh sweet Donna Hurley
 With cunt hair so curley
 Your blond hair seems so soft and stays in place
 When I toss off my cookies in your face
 I'd like to stick my cock in your ass
 But when I think of Lt Andros my cock gets soft fast
 So keep up your spirits and don't get depressed
 Cause even though your a cunt I'd like to press your flesh
 Though in uniform your rude and brass
 your just another sex machine with my cock in your ass

 Next to this semi-literate smut was a graphic drawing of a naked woman labelled "Donna Hurley" and bearing sergeant's stripes. Near the drawing, and apparently written by several different hands, were the scrawled phrases "just another fuck doll," "she should look this good," and "Lt Andros was here." (Lieutenant Andros was a co-worker with whom Hurley was rumored to have had an affair.) Plaintiff cut out the portion of drywall on which this graffiti was displayed, about a square meter in size and an inch thick, and introduced the wall itself into evidence as Exhibit P–1. Describing such a targeted assault as childish drastically underestimates its potential for harm.

3. "Keying out" or "clicking" consists of depressing the "On" and "Off" buttons of a radio transmitter to effectively block the communication of the officer who is using the airwave. In a December 6, 1984, General Order, the ACPD indicated that keying out would be subject to "[s]trict disciplinary action."

## II. THE MOTIONS BEFORE THE COURT

Defendant ACPD moves for a new trial or remittitur on the grounds that: (1) the Court's admission of evidence of harassment directed towards other women was prejudicial error; (2) the Court's admission of evidence that predated the statute of limitations was error; (3) the Court's admission of remarks hostile to women that were made outside the presence of plaintiff or any other female officer was error; (4) the jury's award of punitive damages against the ACPD was inherently inconsistent with its decision not to award punitive damages against Madamba; and (5) the Court's jury charge was misleading.

Defendant Madamba moves for a new trial or remittitur on the grounds that: (1) the evidence against him was insufficient to support a finding of liability; (2) the compensatory damage award was grossly excessive; (3) the Court erred in admitting evidence of incidents that occurred prior to the statutory period or outside the hearing of plaintiff; (4) Dr. Hoyme's testimony constituted a surprise and prejudiced Madamba; and (5) the jury instructions were erroneous.

Defendant John Mooney, who was dismissed from this case on summary judgment, moves for counsel fees. Defendant Nicholas V. Rifice, against whom the jury found no liability, also moves for counsel fees. Plaintiff moves for counsel fees, for a new trial against Rifice, and for a new trial on the issue of punitive damages only with respect to Madamba.

All of the above motions will be denied, except that compensatory damages will be remitted by $400,000, and plaintiff's attorney will be awarded counsel fees in an appropriate amount.

## III. STANDARD OF REVIEW FOR NEW TRIAL

The standard for granting a motion for a new trial pursuant to Fed.R.Civ.P. 59 is less demanding than that for a judgment as a matter of law under Fed.R.Civ.P. 50(a). *Lightning Lube, Inc. v. Witco Corp.*, 802 F.Supp. 1180, 1185 (D.N.J.1992) (citing 9 Charles A. Wright & Arthur A. Miller, *Federal Practice and Procedure* § 2531, at 575 (1971)). Although a trial court has narrow discretion when ruling on a motion for judgment as a matter of law, a trial court ruling on a motion for a new trial is vested with wide discretion.

In ruling on a motion for a new trial, the trial court is permitted to consider the credibility of witnesses and to weigh the evidence. Where a motion for a new trial is based primarily on the weight of the evidence, however, the trial court's discretion is more limited. A court should grant such a motion "only if the record shows that the jury's verdict resulted in a miscarriage of justice, or when the verdict, on the record, cries out to be overturned or shocks the conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991). Because of the time-honored authority of the jury to render a verdict based on its collective wisdom, *New Market Inv. Corp. v. Fireman's Fund Ins. Co.*, 774 F.Supp. 909, 917 (E.D.Pa.1991), the trial court must exercise restraint to avoid usurping the jury's primary function. *Borbely v. Nationwide Mutual Ins. Co.*, 547 F.Supp. 959, 980 (D.N.J. 1981). The Court must proceed with caution because:

> [When a] trial judge grants a new trial on the ground that the verdict was against the weight of the evidence, the judge ... substitutes his own judgment of the facts and credibility of the witnesses for that of the jury.... Such an action effects a denigration of the jury system. Thus, close scrutiny is required in order to protect the litigant's right to a jury trial.

*Lind v. Schenley Industries Inc.*, 278 F.2d 79, 90 (3d Cir.1960). Appellate deference to the trial judge's decision is normally appropriate because it is the district court that was able to observe the witnesses and follow the trial in a way that an appellate court cannot replicate by reviewing a cold record. *Id.*; *Roebuck v. Drexel University*, 852 F.2d 715 (3d Cir.1988), citing *Semper v. Santos*, 845 F.2d 1233, 1237 n. 5 (3d Cir.1988).

Although Fed.R.Civ.P. 59 does not enumerate the bases for a new trial, the following have been recognized as being among

them: the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and substantial errors were made in the admission or rejection of evidence or the giving or refusing of instructions. *Lightning Lube*, 802 F.Supp. at 1186.

## IV. PROCEDURAL HISTORY

On July 10, 1992, plaintiff filed complaints with both the United States Equal Employment Opportunity Commission ("EEOC") and the New Jersey Department of Law and Public Safety, Division of Civil Rights ("DCR"). Both complaints named the ACPD as the sole respondent and alleged that plaintiff had been harassed while on Charlie Platoon and retaliated against since then. However, an affidavit submitted in connection with the EEOC complaint alleged harassment by both Madamba and Mooney during plaintiff's stay on Charlie Platoon. She also alleged that obscene drawings of her remained visible as late as March of 1992, and that her transfer to the Property & Evidence Unit and the denial of her three-percent pay raise were in retaliation for her complaints of sexual harassment.

On January 20, 1993, before the EEOC had issued plaintiff a right-to-sue letter pursuant to 42 U.S.C. § 2000e–5(f)(1), plaintiff and her husband, Patrick Hurley, filed the complaint in Civ. No. 93–260, alleging a violation of 42 U.S.C. § 1983 and various common law contract, tort, and New Jersey statutory claims, including violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 *et seq* ("NJLAD"), and the Conscientious Employee Protection Act, N.J.S.A. 34:19–1 *et seq.* ("CEPA"). On October 12, 1993, the EEOC issued a determination on plaintiff's charge. The EEOC investigator found probable cause for violations of Title VII due to the sexual harassment of plaintiff while she was on Charlie Platoon, but no probable cause for retaliation in the transfer to the Property & Evidence Unit and the denial of the three-percent pay increase.

On March 7, 1994, plaintiff and her husband filed the complaint in Civ. No. 94–1122. This complaint makes no factual allegations, but merely relies on the facts stated in No. 93–260 and alleges discrimination pursuant to 42 U.S.C. § 2000e–2 and retaliation pursuant to § 2000e–3(a). On April 11, 1994, the case was consolidated with Civ. No. 93–260.

On September 24, 1994, plaintiff filed another complaint with the EEOC and the DCR, alleging that since June 10, 1994, she had been subject to retaliation as a result of her initial harassment charge. The events on which this charge were based were not the subject of this lawsuit.

In April 1995, following enormously extensive discovery involving some 70 volumes of deposition testimony, including more than twenty days for depositions of plaintiff and her husband, each of the original defendants—Captain Henry Madamba, Captain John Mooney, Chief Nicholas Rifice, and the ACPD—moved for summary judgment. On August 4, 1995, we granted summary judgment in favor of defendant Mooney. All claims against Madamba and Rifice were dismissed with the exception of claims under the NJLAD. All claims against the ACPD were dismissed except for hostile work environment under Title VII, 42 U.S.C. § 1983, and the NJLAD. The liability portion of the trial was conducted in this case from November 27, 1995, through February 2, 1996. At the conclusion of the liability portion of the trial, the jury rendered a verdict against Madamba and the ACPD but found no liability against Rifice. They awarded $575,000 in compensatory damages and elected to award punitive damages against the ACPD but not against Madamba. On February 13, 1996, a punitive damage hearing was conducted before the jury, at the end of which the jury awarded plaintiff $700,000 in punitive damages.

## V. FACTUAL BACKGROUND [4]

Plaintiff Donna Hurley is an Atlantic City police officer. The ACPD presently has 428

---

**4.** The facts in this case are hotly contested, and at trial there was conflicting evidence with respect to almost everything. Because we are required to give deference to the jury's finding of liability, in this opinion we will present primarily the plaintiff's account of events to the extent evidence in the record supports it.

officers, each of whom reports through a chain of command: Patrol Officer to Sergeant to Captain to Inspector to the Chief of Police.

Hurley alleges that she was subjected to sexual harassment as early as her training in the Police Academy in the mid–1970s. She also alleges that in 1981, she was subject to harassment by then-Sergeant Walter Reay.[5] Plaintiff alleges that for most of her career she was given lowly positions that offered no useful experience or potential for advancement. As a patrol officer, she was assigned to security desk duty (Tr. 2422), which consisted of signing civilians in and out of the department building, and fire watch (Tr. 2423), which consisted of watching one particular building for an outbreak of fire. Neither of these positions offered her the experience needed to advance.

Ms. Hurley began her career at the ACPD in February of 1978, and was promoted to Sergeant in November of 1987. (Tr. 2427.) She became the first woman Sergeant at the ACPD. As a Sergeant, plaintiff alleges that, other than a three-week stint in the detective bureau (Tr. 2431), her assignments continued to be menial. From the detective bureau she was transferred to court liaison officer (Tr. 2438) and from there to the juvenile truancy task force (Tr. 2463–65), where her job was to keep statistics on juvenile truants and where, although a sergeant, she supervised no one.

In late 1989 and early 1990, while plaintiff was assigned to the 8:00 a.m. to 4:00 p.m. shift, or the "Alpha Platoon,"[6] plaintiff filled out a shift preference sheet indicating that she wished to remain on her current shift. However, on January 3, 1990, she was instead transferred to become desk sergeant of Charlie Platoon, the midnight to 8:00 a.m. shift. Plaintiff testified that Charlie Platoon was her last choice in shifts.

Once transferred to Charlie Platoon, plaintiff came under the direct command of defendant Captain Henry Madamba. During her first week under Captain Madamba, he allegedly told her that "they" sent a woman to his unit to "break my balls" (Tr. 2750), and that he did "not expect [plaintiff] to be here on this shift very long." He instructed plaintiff to request a hardship transfer due to her family obligations, but plaintiff refused, in part because she believed it might hurt her professionally. (Tr. 2752.) Plaintiff also claims that Sergeant Fair, who was transferred to Alpha Platoon, was given more favorable days off than she even though he had less seniority. (Tr. 2753.)

Plaintiff alleges that she was harassed throughout her tour on Charlie Platoon. This included "keying out" of her radio transmissions, demeaning comments by Madamba during roll call, and exclusion from supervisors' meetings attended by other sergeants. (Tr. 2780.) Furthermore, sexually explicit and demeaning drawings of and doggerel about plaintiff were carved into and drawn on the walls of the roll call room, the roll call bathroom, and the bathroom of the Masonic Temple, a building used by both ACPD employees and the public. (Tr. 2764.) A sanitary napkin with sergeant's stripes was hung over the roll call podium used by plaintiff and stayed there for three days. (Tr. 2761.)

Plaintiff also alleges that Madamba personally harassed her while she was on Charlie Platoon. In addition to insulting her at roll call and excluding her from sergeants' meetings, he allegedly refused to take action against those who keyed out her radio transmissions and told plaintiff she was "too emotional" when she complained about the sanitary napkin in the roll call room. On September 14, 1990, Madamba sent a memorandum to then-Inspector Rifice stating that plaintiff would often "tie in" sick days with her regular days off. As a result, on September 17, 1990, then-Chief of Police Robert

---

5. Plaintiff alleges that Reay would make inappropriate comments about her hygiene during roll call, would disturb her while she was changing in the drill room, would speak to her in condescending tones during radio transmissions, and held her to stricter standards regarding leaving her post than other officers.

6. ACPD divides its officers into three shifts: 8:00 a.m. to 4:00 p.m., or "Alpha Platoon"; 4:00 p.m. to 12:00 midnight, or "Bravo Platoon"; and midnight to 8:00 a.m., or "Charlie Platoon."

L. McDuffie sent plaintiff a memorandum requiring her to produce a doctor's note every time she took sick leave.

When plaintiff complained to Madamba that the harassment by Charlie Platoon was becoming too much for her, he allegedly replied that female employees in the private sector were protected from such harassment because they "sleep with their bosses." When plaintiff then tried to change the topic of conversation and commented on Madamba's apparent weight loss, he stated that he lost weight by "having sex a few times a day," and that women came to him "when they're ready." (Tr. 2500.) Plaintiff interpreted this entire conversation as a solicitation by Madamba to have sex with plaintiff.

Plaintiff also alleges that co-workers harassed her while she was on Charlie Platoon. At the time, John Mooney was also a sergeant on Charlie Platoon. During their time working together, Mooney allegedly made derogatory comments to plaintiff including a remark that he had heard she "liked them hard and stiff," and that he did "real police work" unlike "those who push pencils and laid on their back." On one occasion, when plaintiff was unable to locate her coffee mug, Mooney asked her if she wanted to drink out of his jock cup. Mooney also made a sexually implicit comment that she was "under the Captain's desk." Plaintiff further alleges that defendant Madamba was present when Mooney made many of these inappropriate comments but took no action against him.

Following unsuccessful efforts by plaintiff's husband Patrick Hurley (who is also an ACPD officer) to intervene on plaintiff's behalf, plaintiff submitted a memorandum to Madamba, on November 1, 1990, outlining the harassment to which she had been subjected during her tour on Charlie Platoon and requesting a transfer. Madamba forwarded Hurley's memo to the Chief of Police along with a memo of his own requesting that an internal affairs investigation be conducted. None ever was.

On November 8, 1990, plaintiff was transferred to the 8:00 a.m. to 4:00 p.m. shift, or Alpha Platoon, in the Property & Evidence Unit. Plaintiff had requested to stay on the midnight to 8:00 a.m. shift because she had adjusted her personal schedule to those hours. In addition, the Property & Evidence Unit is an isolated and undesirable assignment. She therefore alleges that this transfer was in retaliation for the claims of harassment in her memorandum of November 1, 1990. She further alleges that when she was transferred to the Property & Evidence Unit, she was denied a three-percent pay increase that ACPD officers routinely receive when transferred to plainclothes duty. On April 20, 1993, this increase was granted retroactively.

Plaintiff alleges that the harassment continued after she left Charlie Platoon. For instance, the graffiti apparently remained on the walls after plaintiff's transfer. Rifice, who had been promoted to Police Chief, testified that he heard complaints about the graffiti as late as March 1992, and Hurley's husband took photographs of the graffiti in the summer of 1992. An EEOC investigation concluded that "as recent as one week prior to June 23, 1993, sexual graffiti continued to be evident in [plaintiff's] work area." On June 13, 1992, while plaintiff was attending a police seminar, Mooney approached plaintiff and called her "the ass up from the Property Room" in front of two other sergeants.

The final incident of alleged discrimination against plaintiff came in the spring and summer of 1994, and involved a complaint from ACPD officer Kelly Lee Thomas alleging harassment by plaintiff. Plaintiff had allegedly pulled Thomas' hair because she was wearing it in a ponytail rather than up, as required by ACPD regulations. On May 22, 1994, defendant Mooney, then Captain of the Charlie Platoon, wrote a report suggesting that plaintiff receive counselling regarding this conduct. On July 8, 1994, plaintiff was counselled regarding this incident by Captain William McKnight. Captain McKnight told her about the harassment allegations by Officer Thomas and showed her Captain Mooney's report, but refused to give her a copy. Plaintiff alleges that the entire incident was in retaliation for her previous harassment claims.

Prior to October 18, 1991, the ACPD did not maintain a written sexual harassment policy. Before then, an officer who believed she was subject to sexual harassment could report the matter to the ACPD Internal Affairs Unit, the ACPD Affirmative Action Officer, her direct supervisor, or the Chief of Police pursuant to his "open door policy." The officer could also file a grievance with the Police Benevolent Association.

Plaintiff worked continuously until July 26, 1994, after which she went on an extended paid sick leave. Plaintiff alleges that, as a result of the harassment, she has suffered severe emotional distress that has interfered with her work, her personal life, and her family life. Defendants have adduced testimony which suggests that Hurley faced emotional difficulties long before her assignment to Charlie Platoon in 1990, and that her current psychological difficulties stem from sources other than sexual harassment.

## VI. DISCUSSION

A successful Title VII hostile work environment claim consists of five elements: (1) the plaintiff suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would have detrimentally affected a reasonable person in plaintiff's position; and (5) the existence of respondeat superior liability. *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990)). The conduct must be more than "merely offensive," but need not be so severe as to cause "a tangible psychological injury." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

To establish a *prima facie* case of retaliation under Title VII, plaintiff must show (1) that she engaged in protected activity, (2) that she was subjected to an adverse employment decision, and (3) that there was a causal relationship between the two. *Fuchilla v. Prockop*, 682 F.Supp. 247, 263

(D.N.J.1987). Retaliatory harassment, rather than an adverse employment decision, may also form the basis for a retaliation claim. *Goldsmith v. E.I. Du Pont de Nemours & Co.*, 571 F.Supp. 235, 240 (D.Del. 1983); 2 L. Larson, *Employment Discrimination* § 34.04 at 34–57 to –62 (2d ed. 1995).

To state a claim for hostile work environment sexual harassment under the NJLAD, the plaintiff must show that the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. *Lehmann v. Toys 'R' Us*, 132 N.J. 587, 603, 626 A.2d 445 (1993)

To prove *quid pro quo* sexual harassment, a plaintiff must prove that a supervisor engaged in conduct that conditioned tangible job benefits on submission to unwelcome sexual conduct, or penalized her for refusing to participate in such conduct. *Model Jury Instructions: Employment Litigation*, § 1.04(2)(a), p. 38, (American Bar Association 1994) (and cases cited therein); Devitt, Blackmar and Wolff, *Federal Jury Practice and Instructions* § 1.04.09(A) (1987 & Supp.1995) (and cases cited therein).

### A. Sufficiency of Evidence as to Madamba

Madamba argues that the evidence presented at trial was insufficient to impose liability against him individually. The jury apparently disagreed, and we decline to overturn their verdict because we find that it was based on substantial evidence.

The testimony at trial was adequate to support the jury's finding of liability against Madamba on both the hostile work environment claim and, albeit to a lesser extent, on the *quid pro quo* claim. Upon Hurley's assignment to Charlie Platoon, Madamba told Hurley that she, as a woman, had been sent there to "break my stones" (Tr. 2749) [7], and that he did not expect her to last long. Testimony indicated that Madamba frequently made comments that were derogatory to

---

7. The word "stones" was sometimes "balls" in the testimony.

women generally. (Tr. 881, 907.) On at least one occasion, he referred to Hurley as a "dumb cunt." (Tr. 885.) When Hurley sought protection from him, her supervisor, against the harassment she believed she was experiencing, Madamba told her that women frequently sleep with their bosses in order to gain such protection. (Tr. 2499.) The jury could view this remark as conditioning the tangible job benefit of being free from harassment on having sex with Madamba.

Madamba completely ignored the graffiti that was found not only in the bathroom but even in the roll call room. (Tr. 2489.) Once, after a new drawing had appeared in a restroom, Madamba rushed in to see the picture, saying that "I have got to see this." He emerged from the bathroom and proclaimed laughingly to Hurley and several others, "it's a really bad one." (Tr. 2509.) [8]

In addition, Madamba asked plaintiff to submit a transfer request so she could be with her children. (Tr. 2481.) He suggested that women make bad police officers and ineffective supervisors, and always require backup. (Tr. 907, 2554–2555, 2810.)

Testimony further indicated that Madamba undermined plaintiff in other ways that the jury could reasonably have concluded were related to plaintiff's sex, although they are not self-evidently so. *See, Lehmann,* 132 N.J. at 605, 626 A.2d 445 ("not all sexual harassment is sex-based on its face"). For example, testimony indicated that Madamba denied Hurley's vacation requests (Tr. 189), gave her undesirable assignments (Tr. 117, 174), undercut her authority by treating her disparagingly, orally abused her at roll call, excluded her from important meetings, and attempted to transfer her. Such testimony, especially when considered in the aggregate, clearly provided evidence sufficient to support the jury's finding Madamba liable for damages.

**B. *Dr. Hoyme's "Surprise" Testimony***

Madamba argues that the reference by plaintiff's psychological expert, Dr. Hoyme, to a "second diagnosis" regarding a "psychological assault" on Donna Hurley constituted unfair surprise because the testimony was materially different from that offered previously and provided the defendants with no opportunity to counter. This issue is a red herring. It is a product primarily of discovery-based bickering between the lawyers, and secondarily of the institutional differences between lawyers, who demand unvarying precision, and psychiatrists, who confront the complex, variable, and ambiguous realm of human feeling. It has no bearing on the merits of this case and does not even come close to undermining the jury's verdict.

An early report by plaintiff's expert, Dr. Hoyme, was dated November 16, 1994. Defendants' psychological expert, Dr. Toborowsky, responded to Dr. Hoyme's expert report. By way of rebuttal, Dr. Hoyme issued another report on February 20, 1995. On March 2, 1995, Magistrate Judge Kugler ordered that Dr. Hoyme's February 20, 1995, report be barred as out of time. The magistrate judge's decision was appealed to this Court at the summary judgment stage. We upheld the magistrate judge's determination but ruled that we would allow plaintiff to renew the motion at trial, at which time we felt we would have a better sense of the significance of the testimony. Plaintiff therefore renewed the motion at trial. Because we were concerned that the magistrate judge's sanctions against the plaintiff cut too close to the essential truth-seeking function of the Court, we overruled the magistrate judge's decision to bar Dr. Hoyme's report of February 20, 1995. (Tr. 1706.)

A new trial may be granted only if the expert's courtroom testimony varied from his deposition testimony "in such a way as to surprise the [defendant] with unannounced, material changes," *Spurlock v. Lawson,* 881

---

**8.** Although it has not been established under New Jersey law whether inaction can give rise to liability, *see infra,* Part D–3, and we set forth a higher standard that required affirmative conduct in our charge, the jury could certainly have found that Madamba's failure to act in spite of his knowledge that Hurley was being abused provided insights into his mental state, motives, and discriminatory intent. Madamba's inaction might in this manner have assisted the jury in interpreting his affirmative conduct.

F.Supp. 436 (E.D.Ark.1995), which in turn lead to prejudicial surprise "inconsistent with substantial justice." *Conway v. Chemical Leaman Tank Lines, Inc.,* 687 F.2d 108, 111–12 (5th Cir.1982). The circumstances surrounding Dr. Hoyme's testimony, although regrettable and unfortunate, do not even approach this standard.

Defendants' primary complaint is that Dr. Hoyme introduced at trial a novel "second diagnosis" in which he stated that Hurley suffered emotional harm, but not a traditional psychiatric disorder, as a result of the "psychological assault" she suffered in the workplace. (Tr. 1667). He testified that the defendants' conduct constituted an "aggressive attack on her" and a kind of "sexual assault" which caused "severe pain" comparable to "physical touching." (Tr. 1726–29.) Plaintiff's lawyer revisited this theme at closing.

We hold that Dr. Hoyme's testimony did not create prejudicial surprise, and that this case does not meet the standard for a new trial, for four reasons. First, notwithstanding Dr. Hoyme's report of February 20, 1995, his earlier report, dated November 16, 1994, hinted strongly at this "second diagnosis" when he wrote that, "[m]y diagnosis is Adjustment Disorder with mixed features of anxiety and depressed mood (309.28 DSM IV).... This diagnosis carries an implied causal connection between their traumatic experiences (sexual harassment, hostile work environment, and subsequent harassment) and their symptoms." This statement, though terse, plainly expresses Dr. Hoyme's belief that Hurley's suffering was partly caused by the trauma of workplace harassment.

Second, the defendants actually received the report of February 20, 1995, which clarified the issue, and were unquestionably aware of the appealability of the magistrate's order. Third, defendant Madamba, the party presently raising the issue, actually cross-examined Hoyme on this very topic in a deposition on March 3, 1995. By this time Madamba had already received Hoyme's report of February 20, 1995. At the deposition, plaintiff's attorney, Benjamin Folkman, informed Madamba's attorney, Mark Falk, that plaintiff intended to appeal the magistrate's decision to this Court. (Dep. at 78.) Falk responded that he would, therefore, question Dr. Hoyme concerning the barred report, and proceeded to attempt do so. (Dep. at 79.)

Fourth, the "surprise" testimony, such as it was, took place on December 7, 1995. Defendants' expert, Dr. Toborowsky, did not testify until January 24, 1996. (Tr. 4542.) Defendants thus had several weeks in which to prepare rebuttal testimony and, indeed, Dr. Toborowsky indicated on the stand that he had previously read both the deposition and courtroom testimony of Dr. Hoyme. (Tr. 4557.)[9] Under these circumstances there was no surprise.

Dr. Hoyme's testimony as to "psychological assault" was a relatively insignificant component of the case. Although Madamba suggests that it was "inflammatory," this jury was presented with evidence that was considerably more inflammatory than Dr. Hoyme's mild-mannered testimony. Certainly the good Doctor's "second diagnosis" was less inflammatory than the drawings and other materials which were introduced into evidence as the actual weapons of the psychological assault. Dr. Hoyme's telling the jury that Hurley was psychologically assaulted by these materials did not provide them with anything they could not already see for themselves.[10]

**9.** The court reporters (in an admirable performance) produced trial transcript daily throughout the trial.

**10.** Defendants' reliance on *Spurlock v. Lawson,* 881 F.Supp. 436 (E.D.Ark.1995), is misplaced. That case was a medical malpractice action in which a mother sued several doctors who operated on her and thereby, she contended, triggered the premature birth of a child who subsequently obtained cerebral palsy. At trial, defendant's

expert introduced a theory of the cause of the disease that he had never addressed before. He testified that an adult may have shaken the baby so badly that her brain was damaged. In addition to the crucial distinction, addressed above, that there was simply no element of surprise in the case at bar, the *Spurlock* testimony was also incomparably more incendiary than Dr. Hoyme's "second diagnosis." The *Spurlock* defendant tried to turn the case entirely on its head by putting the mother on trial. The district judge

## C. *Evidence Not Obviously Linked to Donna Hurley*

■ Defendants Madamba and ACPD contend that the Court erred in admitting into evidence: (1) sexual harassment directed at other women; (2) derogatory remarks about women made by men outside the presence of women; and (3) incidents that occurred prior to the period to which liability may attach under the statute of limitations. Because we chose to admit all of this evidence for similar reasons—primarily our firm belief that it was crucial to the jury's evaluation of the work environment at the ACPD—we will address the different forms of evidence together.

The Court permitted eight police officers to testify at trial regarding the extent and pervasiveness of hostility towards women in the ACPD. These officers testified that officers and patrolmen commonly referred to women as "cunts," "broads," "bitches," "douche bags" and, as a group, "the crack troop." At least one officer testified that inspectors and captains routinely referred to plaintiff as "the wacky cunt." (Tr. 413, 602, 1039, 1145, 442.)

The Court also permitted four women who had been associated with the ACPD to testify regarding the harassment of women within the department. Deborah Rando, a police officer, testified that Sergeant John Mooney made several harassing and offensive comments to her, including referring to her as "no ass Rando." (Tr. 931.) Rando testified that on one occasion, Mooney told her he would like to rub mayonnaise between her legs so it would look as if a man had ejaculated on her. (Tr. 934.)

Martha Donovan, a municipal prosecutor for the City of Atlantic City, testified that Sergeant Edward Yard of the ACPD called her a "cunt" in front of 50 other people during a confrontation. (Tr. 831.) Finally, two payroll employees, Julia Cardy (Tr. 1166) and Lisa O'Keefe (Tr. 859), testified regarding incidents of harassment and retaliation by Sergeant Griggs and Captain McDonald of the ACPD.

Madamba and the ACPD argue that this testimony should not have been admitted because the incidents occurred outside of plaintiff's awareness, and were therefore irrelevant to the jury's evaluation of Donna Hurley's work environment.

Defendants also argue that the Court should not have permitted testimony about locker-room conversation between men in the absence of women. The ACPD points in particular to Captain Robert Flipping's testimony that men referred to women as "cunts" and "crack troops." (Tr. 404.) Similarly, Officer Munoz testified that women were referred to as "cunts, douche bags, things like that" outside their hearing. (Tr. 768.) Former officer William Hurley (Tr. 1064) and plaintiff's husband, Officer Patrick Hurley (Tr. 1377), offered similar testimony.

Defendants contend as well that evidence of discrimination that took place prior to the beginning of the time period framed by the statute of limitations was improperly presented in this case. The time period for which liability attached in this case ran from January 20, 1987, through January 20, 1993. We allowed testimony concerning several incidents that occurred prior to January 20, 1987, and in particular from the time period of 1978 to 1981. Testimony that plaintiff's supervisor, Sergeant Reay, made sexually offensive remarks in 1981 was admitted into evidence. (Tr. 1213.) We admitted testimony that a tampon (Tr. 1338, 2390) and a copy of *Hustler* magazine (Tr. 2389) were placed in plaintiff's squad car. We also admitted testimony that Hurley was referred to as "the cunt" as far back as 1981. (Tr. 2388.)

Defendants argue that all of this evidence placed them in an impossible position in that they were unable to rebut the testimony because of its age and vagueness. We recognize that the distinction between evidence offered for the purpose of determining liability and evidence offered for its utility in helping the jury to understand the evidence offered for liability is not a simple one. It is not, however, any more complex than other legal issues juries routinely face, or than this

was clearly appalled. Dr. Hoyme, by contrast, offered evidence that expanded only slightly on

themes previously set forth in his expert reports and deposition testimony.

jury faced, for example, with respect to the ACPD's liability for the acts of its employees.

Evidence of harassment of other women and of events prior to 1987 place plaintiff's experience at the ACPD in context. It permits the jury to better understand the events that took place from January 20, 1987, through January 20, 1993. And although we permitted the jury to hear a complete version of plaintiff's experience at the ACPD, we specifically instructed them that, "[y]ou are to consider whether each defendant has engaged in sexual discrimination for the period from January 20, 1987, through January 20, 1993. You may consider evidence from before and after these dates to help you evaluate the defendants' conduct from January 20, 1987, through January 20, 1993, but liability attaches, if at all, only to defendants' conduct during this period." (Jury Charge, § 14.)

The heart of this case was the hostile work environment claim. It is a claim that is very hard for a jury to evaluate and even harder for a plaintiff to prove. It may depend a great deal, for example, on such things as nuance, motives, gestures, the way things are said, and workplace customs.

Permitting evidence of other women's experiences at the ACPD, of the attitudes of male officers towards women generally, and of Hurley's experiences prior to 1987 served several important purposes in this trial. It allowed the jury to gain insight into the motives, attitudes, and intentions of the defendants. It gave them the opportunity to evaluate the adequacy of management's response to Hurley's complaints during the statutory period. It provided the jury with a sense of whether the events that took place during the statutory period were anomalous or accidental, or instead were part of a "pervasive and severe" pattern.

Plaintiff's treatment during the statutory period was unquestionably influenced by and related to her treatment throughout the course of her career at the ACPD. Plaintiff's experience was reflective of the general attitudes of the men around her; those attitudes also influenced, and were revealed in, the treatment of other women in the ACPD.

In a case involving racial discrimination, the Third Circuit held that evidence that anonymous note-writers had referred to plaintiff as a "nigger" was evidential: "the court may also consider as circumstantial evidence the atmosphere in which the company made its employment decisions. One could infer from employees' remarks and the racially derogatory notes [plaintiff] received that management permitted an atmosphere of racial prejudice to infect the workplace." *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632 (3d Cir.1993). Similarly, in *Morgan v. Hertz Corp,* 542 F.Supp. 123 (W.D.Tenn. 1981), the court admitted evidence of a "history of vulgar and indecent language tolerated by management and directed toward women employees." The court held that such evidence was probative of workplace hostility.

All of this evidence, while not forming a basis for liability, permitted the jury to more intelligently evaluate the evidence that did create liability. Barring the evidence would have provided the jury with an incomplete, fragmented picture of the ACPD and plaintiff's life there. It would be like expecting someone to understand a movie, but letting her watch only the final twenty minutes, and letting her hear only the dialogue between the two most significant characters. *See Andrews,* 895 F.2d at 1484 (analogizing to a play and holding that a hostile work environment analysis must concentrate on the "overall scenario" created by seemingly isolated and ambiguous incidents).

By admitting the evidence but forbidding the jury to consider it as directly relating to liability, we were able to balance the interests of the plaintiff and the defendants. The jury was better able to understand and evaluate the events that transpired between January 20, 1987, and January 20, 1993, without the defendants being unfairly prejudiced.

The testimony of other harassment victims tends to prove that plaintiff's experience was not isolated. It suggests that Hurley's experience was not unique and her reaction not unwarranted. It also helps the jury to evaluate the likelihood that the ACPD knew what was taking place. The New Jersey Supreme Court has held that evidence of "harassment

directed at other women was relevant to both the character of the work environment and its effects on the plaintiff." *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 611, 626 A.2d 445 (1993). The court also stated that, "the plaintiff may use evidence that other women in the work place were sexually harassed. The plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others." *Id.*

We agree as well with the court in *Garvey v. Dickinson College*, 763 F.Supp. 799 (M.D.Pa.1991), that such evidence is admissible, among other bases, under Fed.R.Evid. 404 to prove that a defendant harbors "discriminatory intent" towards a particular group. *See, West v. Philadelphia Elec. Co*, 45 F.3d 744, 757 (3d Cir.1995) ("evidence of harassment of others will support a finding of discriminatory intent with regard to a later incident"). We do not find that these incidents were too remote from the plaintiff and her work environment to be relevant, and we firmly believe that they helped to shed light on plaintiff's hostile work environment claims.[11]

---

11. The admission of evidence of sexual harassment directed towards women other than the plaintiff is in fact very well supported in the case law. In addition to its holding in *West*, 45 F.3d at 757, the Third Circuit Court of Appeals has endorsed in dicta the idea that female employees other than the plaintiff should be permitted to testify in *Glass v. Philadelphia Elec. Co.*, 34 F.3d 188, 195 (3d Cir.1994). In that case, plaintiff Glass appealed from a jury verdict denying his claim for race and age discrimination. Glass argued that the district court had abused its discretion when it excluded evidence concerning the racial hostility of his work environment, and yet admitted evidence introduced by the employer showing that Glass had received poor evaluations. Glass had attempted to introduce evidence that would have shown that more senior employees posted hostile and demeaning images about him and that he was the subject of racially derogatory remarks.

The present case, of course, involves the admissibility of evidence of harassment directed not towards the plaintiff, but rather towards other women from her workplace. Nonetheless, the *Glass* court cited with approval cases that have held that evidence of discrimination against other members of the plaintiff's protected class is admissible in deciding a hostile work environment claim. *Id.* at 195, *citing Hawkins v. Hennepin Technical Center*, 900 F.2d 153, 155 (8th Cir.1990) (holding that the district court abused its discretion in barring plaintiff from introducing evidence of sexual harassment of other employees in an action alleging unfair employment decisions based on sex), and *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1421 (7th Cir. 1986) (affirming district court's decision to admit plaintiff's evidence of harassment against other black workers in case alleging racially discriminatory discharge because "evidence was relevant both in showing that Allis Chalmers condoned racial harassment by its workers and in rebutting Allis Chalmers' defense that it had fired Hunter for cause.")

Although the *Glass* decision arose in a factual setting somewhat different from the case at bar, district Judge Huyett of the Eastern District of Pennsylvania faced a similar situation. The Pennsylvania case involved a Title VII claim alleging sexual harassment and discrimination. In admitting testimony by other women, Judge Huyett wrote that, "to determine whether a plaintiff has proven a claim for sexual harassment based upon an intimidating, hostile, or offensive work environment, a court must examine the totality of the circumstances. Included in the totality of the circumstances is evidence of sexual harassment directed at employees other than the plaintiff, which is relevant to show a hostile work environment." *Stair v. Lehigh Valley Carpenters Local Union No. 600*, 813 F.Supp. 1116, 1119 (E.D.Pa.1993).

Other cases have held with compelling consistency that testimony by other members of the plaintiff's protected class regarding the work environment is relevant and admissible. In *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987), a black female security guard brought an action under Title VII for racial and sexual harassment. The appellate court reversed the decision of the trial judge to exclude testimony that a number of the plaintiff's female coworkers had also been sexually harassed by plaintiff's supervisor. The appellate court reasoned that, "[e]vidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Id.* at 1415.

In *Heyne v. Caruso*, 69 F.3d 1475 (9th Cir. 1995), the court reached a similar conclusion. The plaintiff, a waitress, brought a Title VII claim for quid pro quo sexual harassment in which she claimed she had been fired for refusing her employer's sexual advances. The district court granted the employer's motion in limine to bar testimony regarding the employer's alleged harassment of other female employees, reasoning that such testimony, while relevant to a hostile work environment claim, was more prejudicial than probative of a quid pro quo sexual harassment claim. *Id.* at 1477. In reversing, the Circuit court held that, "[t]he sexual harassment of others ... is relevant and probative of [the defendant's] general attitude of disrespect toward his female employees, and his sexual objectification of them." *Id.* at 1480. This logic, which was

Under Fed.R.Evid. 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." In this case, although the defendants were prejudiced by the admission of the disputed evidence, the prejudice was not unfair and did not substantially outweigh the probative value. Moreover, any possibility of unfair prejudice was corrected by the jury charge.

Perhaps more important, the contested evidence was simply not very prejudicial in the context of this case. In a different case, evidence that men spoke ill of women behind their backs, or that other women in the workplace were mistreated, or that the plaintiff was called a nasty name fifteen years ago might be viewed as sufficiently prejudicial to lend substance to a motion for a new trial. But in this case the prejudice was insignificant. This is a case where the plaintiff was compelled to attend roll call in front of a life-size drawing of herself performing oral sex as her supervisor, Madamba, sat eight feet away (Tr. 2488); where, in addition to pervasive graffiti directed at plaintiff, a sanitary napkin bearing sergeant's stripes dangled over the podium from which she spoke (Tr. 2761), and a dildo was affixed to a wall or ceiling nearby (Tr. 430, 1037); and where plaintiff's professionalism and performance were constantly undermined because the men on the force could not tolerate a woman among them. It is a case where the plaintiff's supervisor responded to plaintiff's entreaties by insinuating that he might be able to help her if only she would sleep with him. Amid such evidence, the testimony the defendants now contest can hardly be viewed as unfairly prejudicial.

Finally, defendant ACPD argues that the inclusion of this supposedly extraneous evidence was unfair because the Court's prior rulings were misleading. In particular, the ACPD points to pages 5 and 16 of our slip opinion of August 4, 1995. *Hurley v. Atlantic City Police Department,* 1995 WL 854478 at *2, *6 (D.N.J.1995) (Irenas, J.). On both pages we made reference to our belief that plaintiff's claim centers on the events of 1990. We still believe that the most shocking examples of harassment took place on Charlie Platoon in 1990. Indeed, it is partly because the events of that time were so egregious that we do not believe the admission of earlier evidence carried any unfair prejudice in the trial.

Our statements in the opinion were not, however, intended as an indication that the events of 1990 were all that would be admitted into evidence. Nor can our opinion reasonably be read to suggest as much. As the trial progressed the Court quite naturally gained a better understanding of the case. We determined that the challenged testimony was important to helping the jury understand the events of 1990. For the defendants to have assumed, based on general background statements in our summary judgment opinion, that we were making a final decision as to admissibility at trial is truly an example of hearing what one wants to hear. The defendants had ample notice of this evidence from at least the time they deposed plaintiff. They had ample opportunity to cross-examine and to present counter-testimony from their own witnesses. There was no unfairness and no surprise.

## D. *The Jury Charge*

### 1. *Hostile Work Environment Charge (Jury Charge § 14(b))*

■ Defendants Madamba and the ACPD argue that the jury charge was inaccurate and misleading for a number of reasons.[12] To begin with, both defendants at-

applied in *Heyne* to a quid pro quo sexual harassment claim, is even more compelling in a hostile work environment suit (such as Hurley's), as the *Heyne* district judge noted.

Numerous other courts have concluded that testimony by other members of the plaintiff's protected class is admissible. *See, e.g., Vinson v. Taylor,* 753 F.2d 141 (D.C.Cir.1985), *aff'd in part and rev'd in part sub nom, Meritor Svg. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d

49 (1986); *Hall v. Gus Const. Co., Inc.,* 842 F.2d 1010, 1015 (8th Cir.1988); *Phillips v. Smalley Maintenance Services, Inc.,* 711 F.2d 1524, 1532 (11th Cir.1983); *Webb v. Hyman,* 861 F.Supp. 1094, 1111 (D.D.C.1994); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981).

12. We note for the purpose of clarity that the ACPD has submitted two different versions of that portion of its brief which addressed the jury charge, because the jury charge the ACPD initial-

tack the structure and content of the hostile work environment charge set forth in § 14(b). Defendants argue that the charge strayed from the *Lehmann* standard by mixing Title VII law with NJLAD law. They also argue that we failed to instruct the jury as to precisely how each of the ten listed factors bore on the issue of sexual harassment. Although both accusations are partly true, those decisions were deliberately made and neither was error.

The New Jersey courts have consistently recognized the influence of Title VII law in interpreting the NJLAD. The *Lehmann* court stated specifically that "in interpreting the LAD, New Jersey Courts have, and should continue to, use Title VII law as an interpretive tool." 626 A.2d at 452. The *Lehmann* court itself recognized that sexual discrimination is a "constantly evolving field."

Informed in part by Title VII law, we chose to craft the hostile work environment charge in such a way as to deal with the specific elements of this case. The decision to import Title VII law was deliberate, not only because the ACPD faced Title VII liability,[13] but also because the New Jersey Supreme Court has itself frequently imported Title VII concepts into the NJLAD. We were constantly aware, however, that Madamba and Rifice faced only NJLAD liability. Rather than present two separate, but extremely similar, charges under the NJLAD and Title VII, we chose to merge the two into one charge that accurately expressed both Title VII and NJLAD law.[14] There was no misstatement as to either Madamba or the ACPD. Certainly there was no prejudice. By combining the different areas of

law, we were able to present a single, comprehensible, and cogent presentation of the law of hostile work environment as it relates to the facts of this case.

The root of the hostile work environment charge was a combination of the *Lehmann* instruction and of the hostile work environment charge presented in ABA Model Charges § 1.04(2)(b), p. 40. The resulting draft was subsequently modified by our analysis of the case law and by the submissions and arguments of the parties.

The four-prong *Lehmann* analysis is set forth verbatim on page 15 of the charge. On page 16, we instructed the jury that it "should consider the following factors," and then listed ten of them. These were elements that were present in the case and which we felt the jury could properly evaluate under the law. The relevance of each of these ten factors to a hostile work environment claim is well-rooted in reason, common sense, and the case law.

In the body of the hostile work environment charge, we elaborated on those elements which were crucial to the jury's determination of liability, such as points (4), (5), (7), (9), and (10). The other factors we merely directed the jury to weigh as being properly considered in evaluating hostile work environment liability. The jury was instructed to "consider" the ten factors in helping them to decide whether the requisite elements of liability—which were set forth in plain language immediately above and below the "ten factors"—had been established.

The only "factor" to which any defendant has objected specifically is factor (1),

ly attacked was a draft charge. We address only the ACPD's revised submission. The charge went through several drafts, many of which were submitted to the parties for comment. Indeed, the charge attached as Exhibit A to the ACPD's revised brief also is not the final charge, though it is identical to the final charge except for some very minor adaptations. For the benefit of the parties and the appellate courts, the three separate charges given to the jury are marked in the clerk's file as Exhibits C–6a, C–12 and C–14.

**13.** *Hurley v. Atlantic City Police Department,* 1995 WL 854478 at *7, *17 (D.N.J.1995) (Irenas, J.) (also see decretal paragraph 2 of the Order entered in conjunction with the opinion).

**14.** In fact, the Court's charge conflated not only the NJLAD and Title VII claims, but also plaintiff's complaint under 42 U.S.C. § 1983, which requires a higher standard than the other two and thus added nothing to plaintiff's case, at least not for the purposes of the jury charge. We explained to the parties, on the record, that we did not see enough substantive differences between these laws, as applied to this case, to warrant giving different but substantially similar charges. We presented all counsel with opportunities to submit briefs and proposed charges, and to comment on our charge. At no point did counsel alter our conviction that distinct charges were unwarranted and potentially confusing to the jury.

"plaintiff's reasonable expectation upon entering the workplace," which the ACPD argues is "completely irrelevant" to the issue of liability. This factor had little bearing on the facts of this case or the outcome of the trial. Hurley's expectations were not much in evidence, and we do not think this "factor" played a significant role in this case or the jury's deliberations. Moreover, the factor helps the ACPD more than it hurts them: the jury could reasonably read it as suggesting that Hurley should have realized the ACPD was a rough, macho, sexist place when she joined. Although we do not necessarily advocate such reasoning, it appears to be at the legal roots of the factor. *See, e.g., Rabidue v. Osceola Refining Co.,* 584 F.Supp. 419, 430 (E.D.Mich.1984) after noting this factor the court wrote that, "in some work environments, humor and language are rough hewn and vulgar. Sexual jokes, sexual conversations and girlie magazines may abound. Title VII was not meant to—or can—change this." *See also Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 620 (6th Cir.1986).

Factor (1) is properly considered under the law. Certainly it relates to the "reasonable woman" standard, which no one disputes is applicable to this case. In addition, it is a factor that has been explicitly cited in several Title VII cases. *See, e.g., Rodgers v. Western–Southern Life Ins. Co,* 12 F.3d 668, 674 (7th Cir.1993); *Daniels v. Essex Group,* 937 F.2d 1264, 1274 (7th Cir.1991); *Rabidue,* 805 F.2d at 620; *Brooms v. Regal Tube,* 881 F.2d 412, 418 (7th Cir.1989).[15] The ACPD faced Title VII liability, of course, and we do not believe that it was inappropriate for the jury to have considered factor (1) under the NJLAD.

Madamba argues that our instruction, in factor (10), that the jury should consider "whether the complained of conduct was di-rected at men and women alike" was erroneous because we should have instructed the jury that "the law compels them to find that *no* hostile work environment exists if the complained-of conduct was directed at men and women alike."

We did. In section 14(b) of the jury charge, on page 15, the jury was instructed that "to establish a claim of hostile work environment sexual harassment, plaintiff must prove by a preponderance of the evidence that the conduct about which she complains: (i) would not have occurred but for the employee's gender...." We further emphasized the point on the next page: "It is not enough that the work environment was generally harsh, unfriendly, unpleasant, crude or vulgar to all employees of both sexes. In order to find hostile work environment sexual harassment, you must find that plaintiff was harassed because she is a woman. The harassing conduct may, but need not, be sexual in nature; rather, its defining characteristic is that the harassment occurs because of the victim's sex." Again, the jury was to consider the ten factors in light of the elements of liability set forth in the surrounding text. The requirement that the complained-of conduct be a direct result of the plaintiff's gender, and not something that took place irrespective of gender, was perfectly plain.[16]

Madamba further argues that we "gave undue weight and extended discussion to the 'reasonable woman' standard and bare mention of the requirement that the conduct must be gender-based" and that we should have discussed each element "with equal force." Madamba Brf. at 48. Madamba is correct that we explained the "reasonable woman" standard at greater length than the requirement that the conduct must be gender-based. The "reasonable woman" stan-

---

**15.** We are aware that these last two cases have been criticized to some extent by *Lehmann,* 132 N.J. at 607, 626 A.2d 445, and *Harris v. Forklift Systems,* 510 U.S. 17, 20–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). However, that criticism related only to their holding that a plaintiff is required to prove serious psychological harm. It was not related to the more limited principle for which we cite the cases herein.

**16.** We note as well that Madamba's argument has no support in the evidence. The harassment that took place in this case was in most instances blatantly sexual in nature and obviously occurred because Donna Hurley was a woman. It is rather hard to argue that harassment is not sex-based when it involves dildos, sanitary napkins, misogynistic language, a sexual proposition, disparaging comments about women police officers, and targeted, sexually graphic graffiti.

dard is significantly more complicated than the requirement that the conduct must be gender-based, and more removed from a lay person's understanding and experience. It demanded more explanation. Both were explained adequately, and we are aware of no requirement that the many different ideas expressed in a jury charge must be set forth in the same number of words.

### 2. Structure of the Discrimination Charge (§ 14)

█ Madamba argues that it was error for the jury charge to present four separate bases of liability—intentional sexual discrimination, hostile work environment, *quid pro quo,* and retaliation—by which to judge "precisely the same enigmatic conduct." Madamba Brf. at 47. He asserts that this structure gave the jury and the plaintiff "four bites of the apple" and that it "implied that defendant's conduct was wrong and it was just a question of what category it fell into." *Id.* This argument is meritless.

There is a good deal of overlap conceptually among these four categories, and the same conduct can support liability under more than one of the theories. For example, Madamba's alleged sexual solicitation of Donna Hurley, if true, could easily fall under both hostile work environment and *quid pro quo* discrimination on the basis of sex. Although the heart of plaintiff's claim was unquestionably hostile work environment, we believe there was sufficient evidence presented at trial to warrant instructing the jury on each of the four theories. A finding that a defendant had engaged in any one of them was sufficient to create liability. We simply presented the different legal theories to the jury so that it could apply the law to the facts introduced in evidence. Nowhere did we imply that any defendant was implicated under any theory. Indeed, section 15 of the charge, which immediately followed the sexual discrimination charge, was devoted entirely to addressing the concerns expressed in Madamba's brief.

### 3. Individual Liability (§ 17)

█ Madamba also criticizes the Court's individual liability charge set forth in section 17. In response to a question from the jury, the Court presented an "Amended Version" of section 17 which defined the terms "aid" and "abet" and which was provided to the jury for their perusal during deliberations. The scope of individual liability under the NJLAD has not yet been clearly established. No New Jersey court has resolved the issue.

In *Tyson v. CIGNA,* 918 F.Supp. 836 (D.N.J.1996) (Irenas, J.), this Court expanded on its view of personal liability under the NJLAD. We will not resurvey the legal territory here, but instead refer the reader to *Tyson* for a detailed presentation of our understanding of individual liability under the NJLAD. Briefly, we held in *Tyson* that the NJLAD "imposes liability on supervisory employees only to the extent that the supervisory employee affirmatively engages in discriminatory conduct while acting in the scope of employment. A supervisory employee's omissions, acquiescence, passivity or other failure to act will not support a claim under the NJLAD." *Id.* at 837.[17]

Madamba's primary concern with section 17 is the "aid and abet" language, which he believes may have led the jury to impose liability wrongfully as a result of his failure to respond to harassment by other men in Charlie Platoon. We note, first, that the charge stated explicitly that "individual defendants may be held liable only for their individual, affirmative wrongful acts." Madamba believes that we should have stopped right there, and cites in support *Andrews v. City of Philadelphia,* 895 F.2d 1469 (3d Cir. 1990). The addition of "aid and abet" at the end of section 17 is not inconsistent with our prior directive that "affirmative conduct" is required. When the two are read in conjunction, as they must be, the charge states that a supervisor may be held liable for affirmative, wrongful conduct which aids or abets

17. Although we did not charge the jury concerning scope of employment in section 17 (we did address it in section 16(a)), we do not believe, and Madamba does not argue, that this was error. The conduct for which the jury found Madamba to be liable—and, indeed, probably all of the evidence of harassment in this case—clearly took place within the scope of employment as that phrase is defined in *Lehmann* and *Tyson.*

another's discriminatory conduct. This is, in our view an accurate statement of the law.[18]

New Jersey law on the subject of individual liability under the NJLAD is unsettled. At the time the charge was given, the Third Circuit had not yet issued its opinion in *Sheridan v. E.I. duPont de Nemours & Co.,* 1996 WL 36283 at *13 (3d Cir.1996), rehearing en banc granted, judgment vacated, 74 F.3d 1459 (Feb. 28, 1996), which held that there is no individual liability under Title VII but which has since been withdrawn.[19] To this day, the New Jersey courts have not addressed the topic. If and when they do, they may well, in spite of *Tyson,* attach literal weight to N.J.S.A. 10:5–12(e). We do not pretend to have made the final proclamation on the issue. Reasonable minds can and do differ as to the meaning of N.J.S.A. 10:5–12(e) and the degree of action or inaction required on the part of a supervisory employee in order to establish personal liability. In light of the uncertainty in this field, we do not believe that our charge, which presented N.J.S.A. 10:5–12(e) virtually verbatim, can be viewed as error.

This is even more true when one moves beyond abstract legal theory to consider the evidence presented in this case. Substantial evidence indicated that Madamba personally participated in affirmative sexual harassment by using foul and abusive language towards plaintiff, misusing his position for sexual solicitation, and acting in seemingly neutral ways (e.g., unfavorable assignments, vacation denials, etc.) that had a negative effect on Hurley and which the jury could reasonably have found were based on her sex.

To the extent that Madamba believes he may have been tarnished by his apparent inaction (e.g., with respect to the suspended sanitary napkin and the graffiti), we believe that the original charge was perfectly clear in requiring "individual, affirmative wrongful acts" and in stating that "inaction or delay in responding to the conduct of others" will not create liability.

This point was made even more forcefully by the amended charge we presented to the jury in response to their question regarding the meaning of "aid and abet." The amended charge was influenced by *Baliko v. Stecker,* 275 N.J.Super. 182, 645 A.2d 1218, 1223 (App.Div.1994) (using criminal law definition of "aid and abet" in a NJLAD sexual harassment case). Section 17 (amended version) states clearly that a willful act is required: "In order to aid or abet another to commit an unlawful act, it is necessary that the defendant willfully and knowingly associate himself in some way with the unlawful act, and that he willfully and knowingly seek by some act to help make the unlawful act succeed." The amended charge thus comports with our holding in *Tyson,* which merely set forth the legal standard in a more thorough and scholarly manner. The original charge and the amended version make it perfectly clear that Madamba may not be held liable unless he intentionally involved himself in unlawful, sexually harassing conduct. We see no error.

Finally, the jury's decision to exonerate Rifice suggests that the jury grasped section 17 perfectly. Unlike Madamba, Rifice was implicated in this case almost solely because of his failure to act to help Hurley despite his awareness of her plight. If, as Madamba asserts, the jury found liability against Madamba because of his inaction—which would be in contradiction to our charge in both its

---

18. Even *Andrews* does not support Madamba's argument. At the very page Madamba cites, the court held that supervisory liability can be based on "actual knowledge and acquiescence" and imposed liability on two supervisors in part because they were "aware of the problems concerning foul language and pornographic pictures but did nothing to stop them." 895 F.2d at 1478–1479. To the extent there may be a grey area in defining precisely what supervisory behavior will rise to the level of "affirmative conduct," we explicitly declined to define its boundaries in *Tyson,* noting only that "generally speaking, the conduct must clearly evince the supervisor's subjective intent to engage in discriminatory conduct." 918 F.Supp. at 841 n. 8. By emphasizing that an individual defendant must "wilfully and knowingly associate himself in some way with the unlawful act," we think the *Hurley* charge also made it clear that a subjective intent to discriminate was required.

19. Although the *Sheridan* opinion has been withdrawn, we would hazard to guess that its holding relating to individual liability under Title VII will not change upon rehearing.

original and amended versions—the jury would also presumably have found Rifice liable for his failure to act. That it did not do so indicates the jury's understanding that inaction does not create liability, and its compliance with and understanding of our charge.

### 4. The ACPD's Liability for the Acts of its Non–Supervisory Employees (§ 16(b))

The ACPD argues that "*Lehman* [Lehmann] absolves an employer of liability when it takes reasonable steps to address the alleged sexual harassment," and that we should have so charged the jury. In support of this legal argument, the ACPD cites, not *Lehmann*, but a Title VII case, *Bouton v. BMW of North America*, 29 F.3d 103, 110 (3d Cir.1994) ("we hold that an effective grievance procedure—one that is known to the victim and that timely stops the harassment—shields the employer from Title VII liability for a hostile environment").

There is no question that Title VII has had a powerful influence on the NJLAD. With respect to employer liability, however, the New Jersey courts have explicitly rejected the *Bouton* "shield." The ACPD is simply wrong: *Lehmann* does not automatically protect an employer against liability when it takes reasonable steps to address sexual harassment. Under *Lehmann*,

> In light of the known prevalence of sexual harassment, a plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms. We do not hold that the absence of such mechanisms automatically constitutes negligence, *nor that the presence of such mechanisms demonstrates the absence of negligence.* However, the existence of effective preventative mechanisms provides *some evidence of due care* on the part of the employer.... Similarly, given the foreseeability that sexual harassment may occur, the absence of effective preventative mechanisms will present strong evidence of an employer's negligence.

132 N.J. at 621, 626 A.2d 445 (emphasis added). As the above quotation indicates, the effect of anti-harassment policies on employer liability under the NJLAD is considerably more complicated than the simplistic "shield" of *Bouton*. "[T]he presence of such mechanisms [does not] demonstrate the absence of negligence." *Id.* The presence of even "effective" mechanisms merely provides "some evidence of due care on the part of the employer"; it is not dispositive. *Id.* Indeed, the *Lehmann* court quoted, in the midst of the above paragraph, a passage stating that what is required is "an unequivocal commitment from the top that is not just in words but backed up by consistent practice." *Id.* at 621, 626 A.2d 445.[20]

The jury charge reflects this complexity. In section 16(a), after describing employer policies, we instructed the jury that, "the absence of one or more of the foregoing does not automatically constitute employer negligence, nor does their presence automatically demonstrate the absence of negligence. Rather, their presence or absence are factors you should evaluate in determining whether the employer has acted negligently." In section 16(b), we referred back to this language in discussing "establishing a well-publicized and effective grievance procedure as previously described." The latter portion of that sentence was intended to re-direct the jury's attention to our comprehensive discussion of such policies two paragraphs previously.

The use of the word "all," which appears to be a particular bugaboo of the ACPD, is well supported in the law. The source of this language, which the ACPD asserts is "completely contrary to the state of the law under the [NJLAD]," ACPD Brf. at 56, is in fact New Jersey's Model Jury Charges § 2.22G

20. We note, in passing, that in our view the Title VII and NJLAD standards are probably more different in theoretical expression than in practical application. The *Bouton* shield applies only to "effective" procedures that are known to the plaintiff. The *Lehmann* court held that even "effective" procedures are not necessarily shields. In practice, both standards hinge on effectiveness, which depends on how much teeth upper management gives to its policies. Under either standard, policies that are printed and then forgotten in the filing cabinet of corporate counsel will not protect an employer.

(ICLE 4th ed. 1992). The model charge uses the same language we used, and supports it with citations to 29 C.F.R. § 1604.11(f), its source, and *Meritor Savings v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

It should be noted, as well, that the word "all" arises only in the context of an employer's response once it has "reason to believe that harassment may have occurred." An employer has a higher obligation once it becomes aware of misconduct. If an employer knows that harassment has taken place, it is required to take prompt and effective remedial action. Taking one reasonable step, or two reasonable steps, or even "some" reasonable steps may not prove adequate and effective. If an employer does not take every step that is reasonable in responding to a known instance of sexual harassment, a jury may find that the employer's response was inadequate and ineffective.[21]

Because the *Lehmann* standard does not dictate the legal significance of anti-harassment policies and procedures, our charge merely states that they are factors that must be evaluated in attaching liability to employers. We thus instructed the jury to "consider" these factors. A jury which is told to "consider" employer policies and procedures can only surmise that the presence of such policies and procedures suggests that an employer is at least trying to prevent harassment. The ACPD made this argument to

them innumerable times; the jury concluded that it did not try hard enough.

Whatever the legal merits of the non-supervisory employee portion of the charge,[22] it played an insignificant role in the outcome of this case. There was ample evidence that (1) ACPD upper managers knew or should have known of the harassment, in which case they were required to act whether Hurley complained or not,[23] and (2) upper managers themselves actively participated in the harassment. Indeed, the jury found liability against Madamba for actions that were within the scope of his employment, which automatically creates respondeat superior liability as to the ACPD.[24] Given the overwhelming evidence that upper management knew (or should have known) of the harassment and failed to respond, as well as direct respondeat superior liability through Madamba, this portion of the charge has little legal significance in establishing the ACPD's liability.

Finally, because the ACPD faced both Title VII and NJLAD liability, we believe it was entirely appropriate to use as a standard for employer liability the seemingly lower threshold of employer liability provided for under New Jersey law. It would be unfair to require a jury to apply the higher standards of Title VII law when the defendant is charged with, and potentially liable for, vio-

---

**21.** As previously noted, the ACPD submitted two separate versions of that portion of its brief which dealt with the jury charge. The first version of the ACPD's brief challenged a draft version of the jury charge, which had required an employer to take "all steps necessary to address sexual harassment." The ACPD criticized the "all steps" formulation and informed the Court that "the law requires *only* that the employer take all 'reasonable' steps necessary." ACPD Brief (version one) at 56. Based on similar arguments in chambers, the Court adopted the phrase "all reasonable steps" in its final charge.

**22.** The ACPD has raised no objection to section 16(a) of the charge, which relates to supervisory employees.

**23.** *See e.g., Andrews*, 895 F.2d at 1486 ("if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable.")

**24.** The law under the agency principles set forth in *Lehmann* is that an employer is liable for the wrongful actions of a supervisory employee who is acting within the scope of his employment. Although this exceptionally broad formulation did not create particular difficulties in the case at bar (other than the virtually unworkable complexity of the agency principles upon which *Lehmann* relies, as applied in the context of sexual harassment), we can envision a case in which the absoluteness of this standard of liability could become problematic. For example, where a low-level supervisory employee in a very large corporation engages in harassment while acting in the scope of his employment, and his employer takes prompt and effective remedial action in response thereto, we are not confident that employer liability should be imposed. Such issues are not, however, presented in the case at bar: Madamba was not so lowly, the ACPD is not so large, other supervisors were aware of the conduct, and the ACPD took no remedial action whatever.

lating the lower standards of the NJLAD. The NJLAD standard is lower than and thus inclusive of Title VII liability in this respect. We charged the lower standard for the same reason that we declined to charge the jury with respect to plaintiff's § 1983 claim: the lower standard incorporates the higher one. All the jury need find for liability to attach is a violation of the lower standard.

### 5. Compensatory Damages (§ 21)

■ Defendant Madamba also challenges our compensatory damages charge. There was no objection to this charge previously, and the basis of Madamba's present objection is difficult to discern from his brief. The kernel of Madamba's argument seems to be contained in the following sentence: "the jury should have been specifically instructed in the damage section that it cannot award damages for any conduct that plaintiff was not subjected to, aware of, or with respect to Madamba, which occurred prior to 1990." Madamba Brf. at 49.

Two arguments appear to be nestled within this sentence. The first is that the charge should have limited damages to conduct that Hurley was "subjected to" or at least "aware of." Madamba concedes, correctly, that this point was made earlier in the charge, but believes it should have been reemphasized here. We fail to see why. The charge limited damages to those proximately caused by the "conduct of the defendant in question," the jury having previously been instructed on the importance of evaluating the defendants independently. The jury was instructed only to award damages for plaintiff's actual injuries. We emphasized proximate cause, the defendant's conduct, and the requirement that plaintiff must actually have been injured. The link to the defendant and the requirement that plaintiff have suffered actual harm from the defendant's conduct could not have been plainer.

Moreover, we do not believe it is the law that a sexual harasser is liable only for the conduct that a plaintiff is "subjected to" or "aware of." As we instructed the jury in section 14(b), "Plaintiff's hostile work environment claim must relate to conditions which actually altered her own work environment. Statements, actions, or conditions

which occurred at the Atlantic City Police Department outside the presence of plaintiff, and of which plaintiff was unaware, cannot be considered part of the hostile work environment *unless you find that such statements, actions or conditions affected plaintiff's own work environment*" (emphasis added). In other words, what matters is not whether a plaintiff is "aware of" or "subjected to" particular conduct, but rather whether that conduct actually affected plaintiff's work environment. A plaintiff might well be unaware of specific conduct by a supervisor which nevertheless dramatically affects her work environment. Although plaintiff may never have been "aware of" the conduct or directly "subjected to" it, liability may attach nonetheless if the conduct creates a hostile environment which harms her.

The second argument seems to be that the jury should have held Madamba liable only for the amount of harm he caused himself, and not for harm caused by others or before 1990. Although Madamba does not raise the point directly, in essence he seems to want apportionment of damages. Madamba never raised this point previously. The ACPD raised it once in a charge conference at which Madamba's attorneys were present. Plaintiff's counsel and the Court both pointed out that joint and several liability was the general rule. The Court then informed all counsel that anyone who wanted apportionment could submit briefs on the subject for our consideration. No one ever did.

The overwhelming weight of authority is that compensatory damages may not be apportioned among joint tortfeasors absent explicit statutory authorization. *See* 74 Am-Jur2d, Torts, § 76–80 and Trial, § 1796. There is no statute authorizing apportionment in this case, and we think it was perfectly appropriate to follow the general rule of joint and several liability. At least one other hostile work environment case under Title VII has reached a similar conclusion. *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 506 (1st Cir.1996); *see also Keenan v. City of Philadelphia*, 983 F.2d 459, 463 (3d Cir.1992).

The purpose of the rule of joint and several liability is well served in this case. Mad-

amba argues that he should be held responsible only for the damages he caused during his year of supervising Hurley. The fallacy of this argument is that it is virtually impossible to splice damages. The ACPD, Madamba, and numerous other persons not parties to this case probably contributed to Hurley's injury. No one can say with precision who caused how much of it.

Even if we were to attempt to apportion liability, it is clear that Madamba contributed significantly to the damage Hurley suffered. Under his supervision some of the worst harassment took place—to the point that ultimately, after having worked at the ACPD for 12 years prior to her assignment to Charlie Platoon, Hurley was forced to take a year's sick leave. Substantial evidence indicated that Madamba himself participated directly in that harassment. And although harassment by non-supervisory employees is certainly harmful, the jury could have concluded that harassment by an immediate supervisor greatly exacerbated Hurley's damages.

### E. *Punitive Damages*

A threshold issue with respect to punitive damages is whether they may be awarded against a municipality at all. We believe that imposing punitive damages against a governmental entity has the unfortunate effect of inflicting punishment primarily on innocent taxpayers rather than on the wrongdoer, *see Keenan v. City of Philadelphia*, 983 F.2d 459, 477 (3d Cir.1992) (dissenting opinion), but the New Jersey legislature and courts have determined that exemplary damages against municipalities should be permitted.[25]

 The ACPD may be liable for punitive damages "only in the event of actual participation by upper management or willful indifference." *Lehmann*, 132 N.J. at 624–25, 626 A.2d 445; *Rendine v. Pantzer*, 141 N.J. 292, 314, 661 A.2d 1202 (1995).[26] Conduct more egregious than the mere violation of the NJLAD is needed to support an award of punitive damages. *Catalane v. Gilian Instrument*, 271 N.J.Super. 476, 501, 638 A.2d 1341 (App.Div.1994); *Weiss v. Parker Hannifan Corp*, 747 F.Supp. 1118 (D.N.J.1990).

 The ACPD argues that there was no evidence of actual participation or willful indifference on the part of upper management. In addition, the ACPD argues that the jury acted illogically when it imposed punitive liability on the ACPD but not on Madamba, the principal upper manager who was involved.

Both of these arguments are unpersuasive. The conduct of the ACPD in this case meets the legal standards for liability. There was substantial evidence of actual sexual harassment by upper management, most notably by co-defendant Madamba, whom the jury found to be liable for his actual participation in sexual harassment. (The ACPD does not dispute that Madamba was a member of upper management.) The jury found that Madamba was, with the ACPD, jointly liable for more than half a million dollars in compensatory damages for his acts of sexual discrimination.

There was still more evidence of willful indifference on the part of upper management. Hurley turned to Madamba for help; he only made things worse. Rifice never interceded forcefully. There was a widespread atmosphere of sexual discrimination which was apparent in the language used towards and in reference to female employ-

---

**25.** For an explanation of our reasons for believing that punitive liability may rest in New Jersey against a municipality, we refer the reader to our summary judgment opinion in this case. *Hurley v. Atlantic City Police Department*, 1995 WL 854478 at *15 (D.N.J.1995) (Irenas, J.). The ACPD does not now raise the issue of the legal availability of punitive damages against a municipality. Its present motion challenges their appropriateness on the facts of this case.

**26.** Although the ACPD has not challenged the absence of this precise phrasing from our jury charge in its written post-trial submissions to the Court, ACPD counsel did allude to the issue at oral argument on the post-trial motions. We think the punitive damage and employer liability charges we gave properly presented the law. Moreover, neither the ACPD nor any other party ever proposed this language either in written proposed charges or orally at any of the charge conferences we held. The ACPD did propose this language after punitive liability had been established by the jury's verdict of February 2, 1996, but by that point the jury had already established punitive liability and all that remained was to determine the amount of punitive damages. Their submission was simply too late.

ees, the graffitti, the sanitary napkin, the dildo, and the job assignments given to women. Although this conduct could not possibly have escaped the attention of ACPD upper management, no one ever did anything to stop it. There was more than enough evidence from which the jury could have concluded that ACPD upper management showed "such a conscious and deliberate disregard of the interest of others that [its] conduct may be called willful or wanton." W. Prosser & W.P. Keeton, *Prosser and Keeton on Torts*, § 2, at 10 (5th Ed.1984).

The ACPD knew or should have known of the harassment by Madamba and others and failed to stop it. Its repeated failure to act or even investigate obvious incidents of egregious sexual harassment could permit a jury to conclude that ACPD leadership was wilfully indifferent to—or even condoned [27]—sexual harassment. Indeed, based solely on the manner in which the ACPD chose to conduct this trial (for example by relying on its written policies as justification for its failure to respond more strongly) the jury could reasonably have concluded that further punishment was necessary in order to compel the ACPD to take stronger steps to fulfill its legal obligations towards its female employees.

Nor was it inconsistent of the jury to find punitive liability against the ACPD and not against Madamba. The ACPD's liability is established on different grounds from Madamba's. The ACPD's liability arises in two ways: through respondeat superior for the actions of its supervisors (including Madamba), and as a result of its reaction (or, as in this case, non-reaction) to the acts of both supervisory and non-supervisory employees.

It is not unforeseeable that in some work environments certain employees will engage in sexual harassment, and it is even more predictable in a male bastion such as a police department. Indeed, the need for a vigilant and responsive approach to sexual harassment ought to be more obvious to managers in such environments than it might be to managers of more refined or gender-integrated workforces.

Unlike Madamba, the ACPD may be held liable for its failure to respond to known acts of sexual harassment by others. Thus, in addition to the ACPD's respondeat superior liability for Madamba's affirmative conduct, it also faced liability for the failure by Madamba, Rifice, and other supervisors to actively protect Hurley from obvious harassment. For example, while Madamba may not have been personally liable for his failure to remove the sanitary napkin or respond forcefully to the graffiti, the jury could find that the failure by Madamba and other supervisory employees to respond to such obvious harassment constituted willful indifference on the part of the ACPD.

A similar situation is presented by plaintiff's memo to Madamba dated November 1, 1990, in which she requested a transfer and outlined the sexual harassment to which she had been subjected. Madamba responded, appropriately, by forwarding her memo to the Chief of Police along with a memo of his own requesting that an internal affairs investigation be conducted. Nevertheless, the ACPD willfully ignored both the allegations in Hurley's memo and Madamba's request.

In short, the bases for Madamba's punitive liability are different from those applicable to the ACPD. The jury could reasonably have concluded that Madamba's affirmative conduct, while inexcusable, merited only compensatory damages, whereas the combination of actual participation and willful indifference by ACPD upper management warranted a substantial punitive award.

Moreover, the jury charge was perfectly clear in stating that the imposition of punitive liability was a matter of *discretion* on the part of the jury: "An award of punitive damages is discretionary. In other words, if you find that the legal requirements for punitive damages are met, you may award punitive damages, or you may elect not to award punitive damages." Jury Charge § 23. It was well within the province of the jury to elect not to award punitive damages against

---

**27.** To give one example, Commander Robert Schwarz testified that he did not attempt to put a stop to the sanitary napkin incident or the graffiti because he feared reprisals from more senior officers. (Tr. 160.)

Madamba even if the jury believed that Madamba's conduct was so malicious and wanton as to qualify for punitive damages.

We cannot say, given the facts of this case, that the jury's decision was not based upon substantial evidence. Punitive damages punish a defendant, prevent him from repeating his sins, and provide an object lesson to others, as we instructed the jury. It was perfectly rational for the jury to have decided that these goals would not be furthered by imposing punitive liability against Madamba, but would be advanced by punishing the ACPD. We cannot even fault the jury's exercise of discretion: its distinction between Madamba and the ACPD shows careful judgment and a clear understanding of the differing grounds for individual and employer liability.

### F. *Remittitur*

#### 1. *Compensatory Damages*

■ Both Madamba and the ACPD argue that the compensatory damages award should be remitted. Although plaintiff asserts that the practice of remittitur violates the Seventh Amendment, that argument, weak to begin with, has been completely foreclosed by the recent Supreme Court cases of *BMW of North America, Inc. v. Gore,* —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) and *Gasperini v. Center for Humanities,* —— U.S. ——, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

■ "A remittitur is in order when a trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole, i.e., to remedy the effect of the employer's discrimination." *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1100 (3d Cir.1995), citing *Spence v. Board of Educ. of Christina School Dist.,* 806 F.2d 1198, 1201 (3d Cir.1986). A court should not lower a damage award merely because it would have chosen to award less money, but there must be a "rational relationship between the specific injury sustained and the amount awarded." *Gumbs v. Pueblo Intern., Inc.,* 823 F.2d 768, 773 (3d Cir.1987). A court may look at awards in similar cases in determining whether an award is excessive. *Sassa-*

*man v. Heart City Toyota* 879 F.Supp. 901, 911 (N.D.Ind.1994); *Abrams v. Lightolier,* 841 F.Supp. 584, 593 (D.N.J.1994), *aff'd* 50 F.3d 1204 (3d Cir.1995); *Garrison v. Mollers North America, Inc.,* 820 F.Supp. 814, 822 (D.Del.1993).

Awards for emotional distress in discrimination cases arising under § 1983, § 1981, and Title VII rarely come close to $575,000, and typically are for less than $50,000. *See, e.g., Sassaman,* 879 F.Supp. at 907 (judgment for $2,000 in compensatories and $20,000 in punitives under Title VII hostile work environment claim); *Fernot v. Crafts Inn, Inc.,* 895 F.Supp. 668 (D.Vt.1995) ($48,000 awarded for severe emotional distress with physical manifestations where plaintiff subjected to sexual comments, unwanted physical contact, and termination); *Carter v. Duncan–Huggins,* 727 F.2d 1225 (D.C.Cir.1984) ($10,000); *Dombeck v. Milwaukee Valve,* 823 F.Supp. 1475 (W.D.Wis.1993), *vacated on other grounds,* 40 F.3d 230 (7th Cir.1994) ($25,000 awarded for anxiety disorder caused by sexual harassment and improper touching); *Odima v. Westin Tucson Hotel,* 53 F.3d 1484 (9th Cir.1995) ($10,000); *EEOC v. AIC Security,* 55 F.3d 1276 (7th Cir.1995) ($50,000); *Cygnar v. City of Chicago,* 865 F.2d 827 (7th Cir.1989) (remittitur from $55,000 to $15,000 appropriate for emotional distress damages in discrimination case against Chicago Police Department).

Discrimination cases granting awards in the realm of $500,000 have generally involved measurable economic damages, *see, e.g., Wilmington v. J.I. Case Co.,* 793 F.2d 909 (8th Cir.1986); *Lipsett v. University of Puerto Rico,* 759 F.Supp. 40 (D.P.R.1991), or may be viewed as somewhat anomalous, *Eckmann v. Board of Educ. of Hawthorn School Dist.,* 636 F.Supp. 1214 (N.D.Ill.1986) (remittitur from $2 million to $750,000 where teacher was terminated for unwed pregnancy). Where very large awards have not involved concrete economic damages, they have often been subject to remittitur or been vacated. *See, e.g., Chonich v. Wayne County Comm. Coll.,* 874 F.2d 359 (6th Cir.1989); *Vance v. Southern Bell,* 672 F.Supp. 1408 (M.D.Fla. 1987), *aff'd in part, rev'd in part* 863 F.2d 1503 (11th Cir.1989); *Fitzgerald v. Mountain*

States Telephone and Telegraph Co., 68 F.3d 1257, 1265 (10th Cir.1995) (jury verdict of $250,000 for emotional distress damages found clearly excessive in sex discrimination case).

Under the NJLAD, no reported case has ever even approached the $575,000 jury award here. Cases involving high awards for emotional distress have been vacated. See Jackson v. Consolidated Rail Corp., 223 N.J.Super. 467, 538 A.2d 1310 (App.Div.1988) (over $500,000 jury award in case involving racial harassment leading to discharge led trial judge to order new trial on damages); Catalane v. Gilian Instrument Corp., 271 N.J.Super. 476, 499, 638 A.2d 1341 (App.Div. 1994) (new trial ordered where $250,000 emotional distress damages in an age discrimination case "shocked the conscience of the court"). The single largest reported compensatory damages award for emotional distress under the NJLAD was $125,000. Rendine, 141 N.J. at 311, 661 A.2d 1202 (1995).[28] There, plaintiffs alleged that their employment had wrongfully been terminated when they became pregnant; in the case at bar, of course, plaintiff never lost her job.

In Abrams, 841 F.Supp. at 593, a district court remitted a $100,000 jury award to $2,500 for pain and suffering under the NJLAD. In so doing, the court reviewed NJLAD case law and noted that "New Jersey courts have been careful to award such damages only in cases where the record demonstrates a 'substantial basis for compensation.'" Id. The court further observed that under the NJLAD, awards for pain and suffering have been "nominal, ranging from $500 to $1,500." Id.

Plaintiff has presented expert testimony to the effect that she suffers from an adjustment disorder, anxiety, and depression arising from defendants' conduct. She takes the antidepressant medication Prozac daily. (Tr. 1651–1652.) She feels agitated, fearful, and unable to control her life. (Tr. 1649–1650.) She has testified that the harassment has had a negative effect on her relationship with her husband and children. (Tr. 1732.) She was compelled as a result of the harassment to take a stress leave from work. (Tr. 1840.) The damage may have long-lasting effects. (Tr. 1736.)

On the other hand, plaintiff has lost no pay or benefits as a result of the harassment. (Tr. 2799.) She suffered no physical injury or even physical contact. And testimony by the defendants' expert, Dr. Toborowsky, strongly suggests that the difficulties plaintiff has faced and continues to face are rooted in sources other than workplace harassment, such as a troubled childhood marked by sexual molestation, abandonment, and foster homes; physical abuse by both of her husbands; and other severe personal, marital and family problems unrelated to her work environment. (Tr. 4598.)

Indeed, plaintiff's own psychological expert conceded that plaintiff had a history of depressive illness before ever working on Charlie Platoon. (Tr. 1843.) And in spite of the conduct to which plaintiff was subjected in 1990, she did not attempt to see a psychiatrist about the emotional difficulties that conduct allegedly caused until 1993. (Tr. 4601.) She did not meet with Dr. Hoyme to discuss the events of 1990 until August 1994. (Tr. 1658.) Dr. Hoyme also testified that plaintiff's psychiatric condition could be characterized as one of the "most mild" conditions (Tr. 1773), and that her prognosis for a full recovery was good (Tr. 1734, 1740).

We find that in the circumstances of this case the jury's evaluation of compensatory damages was so excessive as to shock the judicial conscience. This is not to say that the jury was so inflamed that the verdict must be set aside. But the jury allowed its outrage and disgust at the conduct to which Hurley was exposed and its sympathy for her psychological and emotional trauma—much of which is probably unrelated to her work environment—to overcome cool reason in setting compensatory damages.

28. In Milazzo v. Exxon Corp., 243 N.J.Super. 573, 580 A.2d 1107 (Law Div.1990), a jury awarded a plaintiff who alleged handicap discrimination under the NJLAD $276,144 in compensatory damages and $100,000 in punitive damages. Because the opinion was cursory, the facts of the case are unclear, whether judgment was entered for that amount is unclear, and whether the compensatory amount included concrete economic damages is unclear.

Remittitur is thus appropriate. In setting a new figure, we rely primarily on our evaluation of the evidence presented in this case and only secondarily on awards in comparable cases. We also give due deference to the jury's obvious belief that a large award is called for. In addition, we take some guidance from Title VII, which New Jersey courts have acknowledged as a powerful influence on the NJLAD, and which creates a sliding scale of maximum liability, ranging from a cap in damages at $50,000 for employers with fewer than 101 employees to a cap of $300,000 for employers with more than 500 employees. 42 U.S.C. § 1981a. *See Rush v. Scott Specialty Gases, Inc.*, 930 F.Supp. 194, 202 (E.D.Pa.1996) (remitting compensatory damages in discrimination case from $1,000,-000 to $100,000 and punitives from $3,000,000 to $300,000).

Taking all of these factors into consideration, we hold that a compensatory damages award of $175,000 is appropriate in this case. An award in this range is considerably better supported in the case law than the $575,000 of emotional distress damages awarded by the jury. *See, e.g., Rendine*, 141 N.J. at 311, 661 A.2d at 1202 (1995) ($125,000); *Arnold v. City of Seminole*, 614 F.Supp. 853 (N.D.Okl. 1985) (female police officer awarded $150,000 for severe emotional distress as evidenced by post-traumatic stress syndrome and her inability to work arising from harassment that included vulgar comments, sexually graphic graffiti, and disparaging comments about women police officers); *Rowlett v. Anheuser–Busch*, 832 F.2d 194 (1st Cir.1987) ($123,000 awarded to victim of racial discrimination); *Keenan v. City of Philadelphia*, 983 F.2d 459 (3d Cir.1992) (five plaintiffs in police sex discrimination case awarded, respectively, $220,000, $175,000, $175,000, $40,000 and $30,000).

Even an award of $175,000 may be high in light of the testimony that many of Donna Hurley's emotional problems were not caused by her work environment. Nevertheless, it is plain that the harassment Donna Hurley faced at work caused her serious harm. Indeed, she was compelled to leave work on stress leave for a year. (Tr. 1840.) Al-though Hurley clearly had emotional difficulties which preceded the workplace harassment, and it is possible that the harassment she faced would not have caused the "average woman" so much harm, the defendants must take their victim as they find her. *Avitia v. Metropolitan Club of Chicago*, 49 F.3d 1219, 1227 (7th Cir.1995). The remitted award of $175,000 is therefore appropriate.

### 2. *Punitive Damages*

■ The ACPD has not moved for remittitur of the punitive damages verdict, so we will address the issue *sua sponte. See Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Supreme Court has recently established three "guideposts" by which to analyze an award of punitive damages: (1) the reprehensibility of the conduct; (2) the relation between the harm actually inflicted and the punitive award; and (3) the amount of civil or criminal penalties to which the conduct might give rise. *BMW of North America v. Gore*, —— U.S. ——, ——, 116 S.Ct. 1589, 1598, 134 L.Ed.2d 809 (1996). (The third factor is not, in our view, particularly relevant to this case.) Similarly, New Jersey has held that a punitive award should take into account the nature of the wrongdoing, the extent of the harm inflicted, the intent of the wrongdoer, and the wrongdoer's wealth, as well as any mitigating circumstances. *Leimgruber v. Claridge Associates*, 73 N.J. 450, 375 A.2d 652 (1977).

The purpose of punitive damages is to punish the defendant and deter him and others like him from erring again. Where the cost of a punitive award is being passed along to innocent taxpayers, as here, it is difficult to decide what amount is proper punishment. This is especially true since, in New Jersey, the financial worth of the defendant must be taken into account—a factor that is difficult to assess and which affords little real guidance when a municipality is involved. *Herman v. Sunshine Chemical*, 133 N.J. 329, 627 A.2d 1081 (1993); *see also Pulla v. Amoco*, 72 F.3d 648, 659 (8th Cir. 1995). The City of Atlantic City has a tax base of slightly less than $7 billion. For every $100 of assessed value, each taxpayer will pay a penny because of this verdict.

Such a small imposition cannot be said to be out of all proportion to the wealth of the defendant, nor is there any risk that this award will bankrupt the City. *See Arceneaux v. Merrill Lynch,* 767 F.2d 1498 (11th Cir.1985).

As discussed in Part E, *supra,* a jury could certainly find that the ACPD's conduct in this case was sufficiently reprehensible to merit a sizeable sanction. An unprofessional atmosphere of intolerance and misogyny suffused the ACPD. Some of the harmful conduct in this case involved upper management directly. Many other incidents did not directly involve supervisors but could not have escaped the notice of ACPD senior officers, who remained willfully indifferent to the misconduct. Under these circumstances, we cannot say that the imposition of a punitive liability that is four times the remitted amount of compensatory damages[29] on an entity with a $7 billion tax base, and which arises from serious misconduct, is so outlandish as to shock the judicial conscience.

Retired Supreme Court Justice Byron White, sitting by designation in the Eighth Circuit, has adopted a fourth analytical factor in reviewing a punitive damage award: the likely potential harm to others arising from the complained-of conduct. *Pulla,* 72 F.3d at 659. In this case, the ACPD's conduct created an environment that may have harmed not only Donna Hurley and her family but also other women (and perhaps men) in the department and their families. The ACPD knowingly exposed many of its employees to a hostile environment, and the aggregate harm they suffered could well be substantial. This consideration is an additional factor supporting the jury's measurement of punitive damages.

Our remittitur of compensatory damages may not be entered without the consent of the plaintiff. 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* Civil § 2815 (West 1995). In *Spence v. Bd. of Educ. of Christina School Dist.,* 806 F.2d 1198, 1201–02 (3d Cir.1986), the Third Circuit noted that, "an issue may

not be isolated for a new trial 'unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice,'" citing *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). In the case at bar, the issues of liability and damages are too interwoven to allow a fair determination of damages apart from liability. Accordingly, our denial of defendants' motion for a new trial will be conditioned upon plaintiff's filing an acceptance of a remittitur of compensatory damages exceeding $175,000. Should plaintiff not so consent, a new trial as to both liability and damages will be held.

### G. *Plaintiff's Motion for a New Trial*

 Plaintiff moves for a new trial against Rifice on all issues and against Madamba on the issue of punitive damages. Rifice's conduct towards the plaintiff was generally ambiguous. Even those actions which plaintiff perceives as harmful, such as denying funeral leave, are subject to conflicting interpretations. The jury considered the evidence against Rifice and concluded that he did not engage in discriminatory conduct. Their conclusion was amply supported by the evidence. The motion for a new trial as to Rifice will be denied.

Plaintiff also argues that a new trial should be held with respect to Madamba's liability for punitive damages. Plaintiff argues that Madamba's conduct was so egregious as to warrant punitive damages. Her argument misses the point. As our charge indicated, an award of punitive damages is discretionary. Whatever the jury may have thought of Madamba's conduct, it elected not to award punitive damages. Given Madamba's individual liability for substantial compensatory damages, we cannot even fault the jury's exercise of discretion, much less find it unsupportable as a matter of law. The motion will be denied.

### H. *Counsel Fees*

The respective attorneys for Mooney, Rifice, and Hurley have moved for attorney's fees. We shall treat each in turn.

---

**29.** The Third Circuit has recently upheld a punitive damages award of $350,000 in a sex discrimination case involving only $15,000 in compensatory damages—a ratio of more than 23:1. *Coleman v. Kaye,* 87 F.3d 1491 (3d Cir.1996).

### 1. *Defendant Mooney*

The fee-shifting standards for prevailing defendants differ from those for prevailing plaintiffs. *See Sassaman*, 879 F.Supp. at 914. A prevailing defendant may rely on Title VII's fee-shifting statutes, 42 U.S.C. § 1988 and 42 U.S.C. § 2000e–5(k), only if the court finds that the plaintiff's claim was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Under the NJLAD, "no attorney's fees shall be awarded unless there is a determination that the charge was brought in bad faith." N.J.S.A. 10:5–27.1. That a plaintiff ultimately lost does not mean the claim was frivolously brought. *Carrion v. Yeshiva University*, 535 F.2d 722 (2d Cir.1976). The award of attorneys' fees to a prevailing defendant is "not routine" and should only "be sparingly awarded." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497 (3d Cir.1991).

The evidence in the instant case strongly indicates that the plaintiff had ample basis, as a factual matter, for believing that Mooney had sexually harassed her. In essence, plaintiff alleged that Mooney had, on numerous occasions, made obscene sexual remarks to her in front of other officers which made her feel insulted, embarrassed, unwelcome and humiliated. Plaintiff clearly alleged that she believed that Mooney was a major factor in creating the hostile work environment she faced.

The Court granted Mooney's motion for summary judgment for legal reasons. In its opinion dated August 4, 1995, the Court dismissed plaintiff's Title VII claims against Mooney on the grounds that Title VII liability will not lie against a non-supervisory employee. The Court rejected plaintiff's argument that Mooney was a supervisor. *Hurley*, 1995 WL 854478 at *8. The Court granted Mooney's motion on the NJLAD claim for similar reasons. *Id.* at *10.

Our decision on these three legal issues was hardly self-evident. The issue of whether Title VII liability may lie against an individual has been hotly debated, and was unclear in this Circuit at the time the summary judgment motions were filed. Indeed, this court had held previously that individual liability could lie under Title VII. *Bishop v. Okidata*, 864 F.Supp. 416 (D.N.J.1994) (Irenas, J.). As explained in part D–3, *supra*, it now seems probable that Title VII liability will not lie against an individual in this Circuit. The issue of whether Mooney was legally Hurley's supervisor was at least debatable. *See Cook v. Applied Data Research*, 1989 WL 85068 (D.N.J.1989); *Guyette v. Stauffer Chemical Co.*, 518 F.Supp. 521, 525 (D.N.J.1981).

More importantly, the law of individual liability under the NJLAD was, and to a certain extent still is, largely unsettled. As we noted in our initial *Hurley* opinion, no New Jersey Court had squarely addressed the issue. *Hurley*, 1995 WL 854478 at *10. There was substantial statutory authority under N.J.S.A. 10:5–12(e) to support plaintiff's good-faith belief that individual liability could be imposed on those who "aid or abet" misconduct. *See Tyson*, 918 F.Supp. at 836. Although we ultimately held in both *Hurley* and *Tyson* that co-workers may not be held liable, plaintiff's argument was not ill-founded or brought in bad faith.

An action cannot be deemed frivolous or groundless when based upon an unsettled question of law. *See, Christiansburg*, 434 U.S. at 422, 98 S.Ct. at 700–01; *EEOC v. Children's Hospital of Pittsburgh*, 556 F.2d 222 (3d Cir.1977). Although plaintiff's arguments with respect to Mooney did not ultimately prevail, there was sufficient uncertainty in the law, both as a theoretical matter and as applied to the facts of this case, that we cannot find that plaintiff's suit against Mooney was frivolous or brought in bad faith. Mooney's fee application will therefore be denied.

### 2. *Defendant Rifice*

The evidence of direct sexual harassment by Rifice was notably weak. Hurley herself complained of only five affirmative acts by Rifice: (1) he transferred her to the Property and Evidence Unit; (2) he denied her access to Chief McDuffie; (3) he denied her a three-percent pay raise; (4) he denied her

funeral leave; and (5) he condoned Internal Affairs investigations regarding her. Each of these acts is subject to conflicting interpretations. Of course, the evidence that Rifice was aware of Hurley's plight and ignored it was considerably stronger.

We have said from the beginning that we did not believe that the case against Rifice was terribly strong. Nevertheless, there was enough factual uncertainty to warrant denial of the motion for summary judgment, a motion to reconsider, and sundry motions to dismiss that were made as the case progressed. In our opinion denying summary judgment as to Rifice, we wrote that, "as to Rifice, plaintiff has adduced evidence that in his supervisory capacity as Inspector and then Chief of Police, he was woefully indifferent to her complaints regarding sexual harassment and obscene graffiti on the walls in the ACPD facilities." *Hurley,* 1995 WL 854478 at *15. Following Rifice's motion to reconsider that decision, we held that, "on the basis of this record, the Court simply cannot conclude that the NJLAD claim against Rifice is without merit." Opinion on Reconsideration at 5.

Although the jury's verdict confirmed our initial view of the case against Rifice, it would be unfair to expect the plaintiff to have possessed, more than a year ago, the understanding of the legal and factual implications of the case that we developed only during the course of trial. Moreover, it was unclear, as a legal matter, whether individual liability could be imposed on a supervisory employee for his inaction. Given that the Court was unsure whether liability could attach to Rifice's conduct, we see no reason why plaintiff should have withdrawn her case voluntarily. Plaintiff's suit against Rifice was not frivolous, nor was it brought in bad faith. Rifice's motion for fees will therefore be denied.

### 3. *Plaintiff*

Title VII, the NJLAD, and § 1983 all permit fee shifting in favor of a prevailing plaintiff. *See* 42 U.S.C. § 1988(b); 42 U.S.C. § 2000e–5(k); N.J.S.A. 10:5–27.1. In this case, an award of attorney's fees to plaintiff's counsel is unquestionably appropriate. Calculation of the fee amount under the three statutes differs only slightly, in ways that will be developed below.

Plaintiff's attorney seeks an award based on the following hourly rate schedule and billing record:

| | | |
|---|---|---|
| * Clifford Van Syoc—1,153.6 hours @ $300/hour— | $346,080.00 |
| * Benjamin Folkman—254.65 hours @ $225/hour— | $ 57,296.25 |
| * Evan Blaker—233.8 hours @ $175/hour— | $ 40,915.00 |
| * Junior Associates — 512.6 hours @ $115/hour— | $ 58,949.00 |
| * Law Clerks—433.05 hours @ $85/hour— | $ 36,809.25 |
| * Paralegals—826.25 hours @ $60/hour— | $ 49,575,00 |
| | $589,624.50 |

In addition to this "lodestar" figure, *see Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167–68 (3d Cir.1973); *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 116–117 (3d Cir.1976), Mr. Van Syoc argues that the lodestar should be increased to account for the high quality of the representation, the successful result, the "hard-nosed" opposition by the defense, a contingency enhancement, and prejudgment interest on the compensatory damages award.

Defendants have argued that both the hourly rates and the hours expended are excessive. We agree that Mr. Van Syoc's proposed hourly rates are ambitious. The defendants have submitted an affidavit accompanied by a letter from Jack Plackter, Esq., of the law firm of Horn, Goldberg, Gorny, Daniels, Plackter & Weiss. Mr. Plackter writes that his firm charges the following rates: partners, $95–$225; associates, $85–$150; paralegals, law clerks, and other unlicensed legal assistants, $50–$70.

We believe that Mr. Plackter's submitted rates provide a more suitable framework in which to set fees. Based on Mr. Plackter's letter, the other evidence in the record, the Court's close familiarity with the New Jersey legal market, our direct experience with Mr. Van Syoc and his employees, and applicable case law, we will apply the following hourly rates: Mr. Van Syoc: $200.00; Mr. Folkman: $150.00; Mr. Blaker: $115.00; Junior Associates (Allen, Kopelson, Erdek, Byler): $85.00; Law Clerks and Paralegals: $50.00.

We have reviewed the timesheets submitted by the plaintiff's attorney. As a general matter, we do not believe they are excessive and redundant. The defendants themselves present few specific complaints about the

timesheets, relying instead on vague denunciations of excessiveness. This was a grueling litigation for all. Plaintiff's attorney was pitted against a team of defense lawyers; in the courtroom, he routinely faced five adversaries. Although plaintiff's attorney has expended a great deal of time on this case, we see no evidence that it was excessive.

 The defendants are correct, however, that the total number of hours expended must be reduced by the number expended in pursuit of unsuccessful claims. In a case in which the plaintiff's claims are based on different facts and legal theories, and in which the plaintiff has prevailed on only some of those claims, a district court should exclude the hours spent on the unsuccessful claims when determining the amount of a reasonable fee. *Texas State Teachers Association v. Garland Independent School District,* 489 U.S. 782, 789, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989); *Hensley v. Eckerhart,* 461 U.S. 424, 435–36, 440, 103 S.Ct. 1933, 1940–41, 1943, 76 L.Ed.2d 40 (1983); *Knight v. State of Alabama,* 824 F.Supp. 1022, 1029 (N.D.Ala.1993). If a plaintiff does not prevail on all claims and overall obtains only "partial or limited success, a District Court must reduce the award of attorney's fees." *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941; *Knight,* 824 F.Supp. at 1029.

 In particular, the defendants argue that the hours should be reduced by the time plaintiff's attorney spent on: (1) unsuccessful claims against Mooney and Rifice; (2) Patrick Hurley's unsuccessful claim for loss of consortium; and (3) unsuccessful state law claims. We agree.

Plaintiff's claims against Mooney as well as Patrick Hurley's *per quod* claim were dis-missed on summary judgment. Plaintiff's claim against Rifice was rejected by the jury. Plaintiff also brought several state law claims that were struck at summary judgment, such as claims under CEPA; New Jersey public policy; intentional infliction of emotional distress; malicious interference with contractual relations; defamation; and false light invasion of privacy.

Hours spent in pursuing these claims must therefore be struck from the lodestar calculations. Rather than attempting to cull that material ourselves from Mr. Van Syoc's timesheets, we will enter an order requiring Mr. Van Syoc to submit to this Court within three weeks a revised timesheet from which the relevant hours have been deleted.[30] Defendants will have two weeks from that time in which to respond to the new timesheets. (These submissions should not be viewed as an opportunity to revisit the issues already decided in this opinion.) The Court will at that time determine whether Mr. Van Syoc has made a good-faith effort to cull his hours and engage, if necessary, in a more particularized analysis of hours expended.[31]

A lodestar enhancement based on the quality of the representation, a successful result, or the aggressiveness of the defense is not warranted in this case. All these factors are amply accounted for in the lodestar figure. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 566, 106 S.Ct. 3088, 3098–99, 92 L.Ed.2d 439 (1986). An upward adjustment based on the "exceptional quality" of a lawyer's work is only rarely given. *Student Public Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436, 1453 (3d Cir.1988). Certainly Mr. Van Syoc's

---

30. We recognize that these claims may be substantially intertwined with the successful claims. *See Sassaman,* 879 F.Supp. at 915 (to the extent unsuccessful claims arise from a "common core of facts," they need not necessarily be barred). Nonetheless, it should not be terribly difficult to remove hours spent with respect to Mooney, Rifice, and Patrick Hurley. As for the unsuccessful state law claims, we suspect they were largely a matter of pleading and required few extra hours. We leave it to plaintiff's attorney to work with his own timesheets.

31. The recent case of *Coleman v. Kaye,* 1996 WL 348069 at *20 (3d Cir.1996), suggests that a hearing may be desirable in determining a reasonable hourly rate. Although the facts of that case are probably distinguishable based on the higher quantum of evidence in the instant record, if any party should desire a hearing we will entertain motions to that effect. Such motions should not be filed until *after* we enter a final order based on Mr. Van Syoc's submission of revised timesheets, and *must* be submitted, if at all, within two weeks of the date of said final order.

performance in this litigation was impressive. Nevertheless, his talents and experience are amply reflected in his high hourly rate, and his hard work is expressed in the hours expended. The lodestar thus takes into consideration his strong performance.

Plaintiff cites *Lipsett v. Blanco,* 975 F.2d 934 (1st Cir.1992) in support of his argument that the "scorched earth," "Stalingrad Defense" tactics of his adversary warrant an additional enhancement. None of the attorneys in this case, including plaintiff's, have made it a point to extend professional courtesies to their adversaries. The conduct of the defense was no worse in this respect than that of the plaintiff; certainly it was not so egregious as to warrant an enhancement. Moreover, the aggressiveness of the litigation is reflected in the hours billed and is thereby incorporated into the lodestar.

■ A contingency enhancement may not be granted at all under the federal fee-shifting statutes. *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). In spite of *Dague,* however, the New Jersey Supreme Court has held that in suits under the NJLAD, a contingency enhancement *must* be considered. *Rendine v. Pantzer,* 141 N.J. 292, 661 A.2d 1202 (1995). Defendants argue that we should disregard *Rendine* because we are a federal court, and also because our "hybrid" jury charge failed to establish liability under the NJLAD.

The argument that a federal court applying state law through supplemental jurisdiction may simply ignore the supreme court of the state in which it sits merits no discussion. It is patently wrong. The argument concerning the jury charge merits minimal discussion. We have said from the beginning that we see no significant differences between Title VII and the NJLAD as applied to this case and for purposes of charging the jury. We view the jury's verdict as a finding of liability under Title VII and the NJLAD (although not necessarily under § 1983, which imposes a higher standard for liability than that provided in the charge). That liability was established under the NJLAD is further demonstrated by the jury's finding of liability against Madamba, who faced only NJLAD claims, and by the jury's imposition of punitive damages on the ACPD, a remedy which is available only under the NJLAD.

We conclude, therefore, that we are required to conduct a *Rendine* analysis. *Rendine* requires us to take into account the prevailing attorney's risk of nonpayment in all contingency cases. *Rendine* suggested that contingency enhancements should ordinarily range between five and fifty percent of the lodestar fee, with the enhancement most often falling between twenty and thirty-five percent. In the present case, Mr. Van Syoc agreed to represent plaintiff on a contingency basis, his payment to depend entirely on eventual success and the fee-shifting statutes.

The parties never came close to settling the case, so Mr. Van Syoc was provided with little opportunity to minimize his downside risk. Hurley's damages were based entirely on her pain and suffering; there was no concrete element. The risk of non-payment in this case was thus reasonably high. On the other hand, plaintiff's case was strong. The concrete evidence of sexual harassment was there. And plaintiff was never willing to reduce her own ambitious settlement demands meaningfully. Under these circumstances (and following the example set by the *Rendine* court, 141 N.J. at 345, 661 A.2d 1202) we find that a contingency enhancement in the amount of one-third of the lodestar fee is warranted in this case.

■ The final issue before us is the question of pre-judgment interest. Plaintiff moves for pre-judgment interest on the compensatory damages award only. There is some dispute between the parties as to whether or not pre-judgment interest may be applied against a municipality. Although we need not reach the issue because of our decision not to award such interest as a matter of discretion, *infra,* we note that pre-judgment interest probably is an available remedy under the NJLAD, even against a municipality, for the same reason that we determined in our summary judgment opinion in this case that punitive damages are available. N.J.S.A. 10:5–13; *Abbamont v. Piscataway Bd. of Educ.,* 138 N.J. 405, 425–432, 650 A.2d 958 (1994); *Milazzo v. Exxon*

*Corp.,* 243 N.J.Super. 573, 580 A.2d 1107 (Law Div.1990). Of course, Madamba would not enjoy immunity from pre-judgment interest even if the ACPD does.

■ An award of pre-judgment interest lies within the discretion of the trial court. Pressler, 1995 N.J. Court Rules 4:42–11(a); *Ambromovage v. United Mine Workers,* 726 F.2d 972 (3d Cir.1984). The purpose of an award of pre-judgment interest is to compensate the plaintiff for the defendants' use of plaintiff's money after the cause of action accrued but before judgment was entered. In the case at bar, plaintiff has received adequate compensation for her injuries. She has also received $700,000.00 in punitive damages. Indeed, the punitive damages award is pure windfall. We decline to exercise our discretion to increase the size of that windfall. To do so would indeed result in an "unusual inequity." *Brock v. Richardson,* 812 F.2d 121, 127 (3d Cir.1987). Accordingly, no pre-judgment interest will be awarded.

## VII. CONCLUSION

Because the jury's findings were adequately supported by the evidence presented at trial, and because there was no prejudicial legal error, the various parties' motions for a new trial will be denied. Defendants' motion for remittitur of compensatory damages will be granted, but the jury's punitive award will stand. The motions by defendants Mooney and Rifice for counsel fees will be denied. Plaintiff's motion for counsel fees will be granted, subject to the submission by plaintiff's counsel of revised timesheets striking hours expended in pursuit of failed claims and parties. An appropriate order will enter on even date herewith.